[Nos. 77167-7; 77516-8.   En Banc.]
Argued June 15, 2006.   Decided April 12, 2007.

FORD MOTOR COMPANY, *Appellant*, v. THE CITY OF SEATTLE, EXECUTIVE SERVICES DEPARTMENT, *Respondent*.

FORD MOTOR COMPANY, *Appellant*, v. THE CITY OF TACOMA, *Respondent*.

34

36

*Scott M. Edwards, Marie G. Aglion,* and *Donald M. Young* (of *Perkins Coie, LLP*), for appellant.

*Thomas A. Carr, City Attorney,* and *Kent C. Meyer, Assistant,* for respondent City of Seattle.

*Elizabeth A. Pauli, City Attorney,* and *Cheryl F. Carlson, Assistant,* for respondent City of Tacoma.

*Robert M. McKenna, Attorney General, Donald F. Cofer* and *Anne E. Egeler, Senior Counsel,* and *Cameron G. Comfort, Senior Assistant,* on behalf of the Department of Revenue, amicus curiae.

¶1 ALEXANDER, C.J. — We granted direct review of two separate trial court orders that upheld the imposition by the cities of Seattle and Tacoma of a business and occupation (B&O) tax upon the Ford Motor Company for its activities related to being in the business of making wholesale sales to dealers. Ford filed separate legal actions against both cities in order to recover B&O taxes, interest, and penalties it paid. We now review whether the cities used the proper tax classification and tax measure in calculating Ford's B&O taxes. We conclude that they did and consequently affirm the determinations of both trial courts.

I

¶2 Ford is a Delaware corporation, registered to do business in the state of Washington. Ford's principal place of business is in Dearborn, Michigan. Ford has manufacturing plants in several states, but none in Washington.

Although Ford maintains an office in Bellevue, Washington, it does not directly sell vehicles to consumers in the cities of Seattle or Tacoma.

¶3 Ford does, however, sell automobiles, parts, and accessories to independent dealers located within the cities of Seattle and Tacoma. These dealers, in turn, sell the automobiles, parts, and accessories to retail customers. Ford also conducts a variety of business activities within Seattle and Tacoma related to the sale of its cars, parts, and accessories to dealers. These activities include: advertising, sending representatives to meet with its dealers and their part managers, imparting information about new products, discussing problems and customer satisfaction concerns, and marketing and selling warranties on its automobiles. Ford has stipulated that all of these activities were for the business purposes of selling Ford products to dealers located in Tacoma and Seattle and helping those dealers sell Ford products to retail customers.

¶4 The city of Seattle audited Ford for the period of January 1998 through December 2002. It then assessed a B&O tax on the ground that Ford was engaged within Seattle in the business of making sales at wholesale and assessed the tax on the entire gross proceeds from vehicles sold to Seattle dealers. Ford paid the assessed amount of $401,968. It then filed a lawsuit in King County Superior Court to obtain a refund and declaratory judgment as to the proper method of calculating its tax liability. The city of Seattle moved for a summary judgment dismissing Ford's claims. The trial court granted the city's motion, determining that there was no merit to Ford's claims that (1) it did not make sales within the city of Seattle as that term is used in the Seattle Municipal Code and (2) the gross income Ford received from its dealerships had to be apportioned in order to be constitutional.

¶5 The city of Tacoma also audited Ford, imposing a B&O tax, interest, and penalties for the period from January 1, 1990, through December 31, 2002 (audit period). Ford paid the amount assessed of $1,307,933.83 and filed suit in

Pierce County Superior Court seeking a refund. After a bench trial, the trial court dismissed Ford's classification and apportionment challenges, which were the same as those made in the King County suit. That court also denied Ford's separate claims that (1) the city of Tacoma was barred from collecting taxes for the period from 1994 through 1999 by the statute of limitations and (2) Ford was not properly assessed.

¶6 Ford appealed both the King County summary judgment order and the Pierce County trial judgment, seeking direct review in this court. The two appeals were consolidated and review was granted pursuant to RAP 4.2(a)(4), our court determining that both cases presented issues of substantial public importance.

## II

¶7 A B&O tax is an excise tax imposed for "the privilege of doing business" in a particular jurisdiction. 1B KELLY KUNSCH ET AL., WASHINGTON PRACTICE: METHODS OF PRACTICE § 72.7, at 452 (1997). Washington imposes a B&O tax for the privilege of doing business in this state. RCW 82-.04.220. Cities may also impose their own B&O tax for the exercise of the privilege within that city. The value of the "privilege is measured by the gross proceeds of the business; the rate of tax is determined by the type of business in which the taxpayer is engaged." 1B KUNSCH ET AL., *supra*, § 72.7, at 452.

¶8 A tax statute has three basic elements: "First, there must be an incident that triggers the tax." *Id*. § 72.3, at 449. The "taxable incident" is the "activity that the legislature has designated as taxable." *Id*. Second, there must be a base that represents the value of the taxable incident. This is known as the "tax measure." *Id*. Third, there must be a "tax rate," which, when multiplied by the tax measure, determines "the amount of tax due." *Id*. At issue in this case are the taxable incident and tax measure of Seattle and Tacoma's B&O tax.

## A. The Taxable Incident

▮ ¶9 It is well established that the tax "incident" for a B&O tax is generally the " 'act or privilege of engaging in business activities' " in the taxing jurisdiction. *Id.* § 72.6, at 451 (quoting RCW 82.04.220). Unlike a sales tax, which taxes a specific sale of a good or service, the B&O tax is imposed on the general privilege of engaging in business. As noted above, Seattle and Tacoma both impose B&O taxes on the "privilege of engaging in business activities within" their respective cities. SEATTLE MUNICIPAL CODE (SMC) 5.45.050; former TACOMA MUNICIPAL CODE (TMC) 6.68.220 (1998).[1]

¶10 A major determinant of B&O tax liability is how the taxed activity is classified. Under the relevant codes, the tax rate is based upon the type of business activity performed by the taxed entity within the applicable city. The various types of activity include (1) "engaging . . . in the business of making sales . . . at wholesale" within the city, under SMC 5.45.050(C), and (2) the general classification for engaging within the city in "any business activity other than or in addition to those enumerated in the above subsections," under SMC 5.45.050(G). *See* former TMC 6.68.220(B)(F)(2).[2]

¶11 The cities imposed their B&O tax on Ford under the "engaging in the business of making sales at wholesale" provision. In relevant part, Seattle's provision is as follows:

> Upon every person engaging within the City in the business of making sales . . . at wholesale or retail . . . ; as to such persons, the amount of tax with respect to such business shall be equal

---

[1] During the audit period, the city of Seattle reorganized and amended its tax code by enacting chapter 5.45 SMC and repealing chapter 5.44 SMC effective January 1, 2002. Consequently, two different code provisions were in effect. Despite the change, the substance of the city's B&O taxation scheme remains substantively the same and the revisions do not impact the analysis in this case.

[2] The tax rate on "making sales" is .00215 percent in Seattle and .00102 percent in Tacoma. SMC 5.45.050(C); former TMC 6.68.220(B). The tax rate on other business activities is .00415 percent in Seattle and .0038 percent in Tacoma. SMC 5.45.050(G); former TMC 6.68.220(F).

to the gross proceeds of such sales of the business without regard to the place of delivery of articles, commodities or merchandise sold, multiplied by the rate of two hundred fifteen one-thousandths of one percent (.00215).

SMC 5.45.050(C). The city of Tacoma has a similarly worded provision in its tax code, former TMC 6.68.220(B), with the exception that its tax rate is one hundred two one-thousandths of one percent (.00102).

¶12 Ford contends that its activities were improperly classified because it did not make sales at wholesale within the cities. Ford would have us construe SMC 5.45.050(C) and former TMC 6.68.220(B) narrowly, holding the taxable incident to be the actual sale of products within the respective taxing jurisdictions to dealers. Ford contends that proper application of the B&O tax ordinances would classify its business activities in the cities under the "other business activities" provisions.

¶13 In analyzing the positions of the parties, we start with the principle that the burden is on the taxpayer to prove that a tax paid by him or her is incorrect. In other words, "[t]axes are presumed to be just and legal, and the burden rests upon one assailing the tax to show its invalidity." 72 AM. JUR. 2D *State and Local Taxation* § 1000 (2006).

¶14 Municipal ordinances, such as the ordinances at issue here, are local statutes that are to be construed according to the rules of statutory construction. *McTavish v. City of Bellevue*, 89 Wn. App. 561, 565, 949 P.2d 837 (1998). Where a statute is clear on its face, its plain meaning should "be derived from the language of the statute alone." *Kilian v. Atkinson*, 147 Wn.2d 16, 20, 50 P.3d 638 (2002) (citing *State v. Keller*, 143 Wn.2d 267, 276, 19 P.3d 1030 (2001)). Constructions that would render a portion of a statute "meaningless or superfluous" should be avoided. *Keller*, 143 Wn.2d at 277. Construction of a statute is a question of law that is reviewed de novo. *W. Telepage, Inc. v. City of Tacoma Dep't of Fin.*, 140 Wn.2d 599, 607, 998 P.2d

884 (2000). However, when construing an ordinance, a "reviewing court gives considerable deference to the construction of" the challenged ordinance "by those officials charged with its enforcement." *Gen. Motors Corp. v. City of Seattle*, 107 Wn. App. 42, 57, 25 P.3d 1022 (2001).

¶15 Here, the cities, which enforce their own municipal codes, reach the same conclusion as the trial courts: a B&O tax on engaging in the business of wholesaling is levied upon the privilege of doing business as a wholesaler, not upon the actual sales at wholesale. We agree. A tax imposed on the actual sale of products is, by definition, a sales tax. B&O taxes, on the other hand, are not sales taxes. The cities' municipal codes plainly tell us that their B&O taxes are imposed on "the act or privilege of engaging in business activities within the City." SMC 5.45.050; former TMC 6.68.220. Therefore, the plain meaning of the statutes at issue is that the taxable incident in SMC 5.45.050(C) and former TMC 6.68.220(B) is "*engaging* within the City *in the business of* making sales . . . at wholesale," not merely "making sales at wholesale." (Emphasis added.) To find otherwise would render the words "engaging . . . in the business of" superfluous.

¶16 Engaging in the business of wholesaling encompasses more business activities than merely making sales. Both Seattle and Tacoma define "business" within their tax code as "all activities engaged in with the object of gain, benefit, or advantage to the taxpayer or to another person or class, directly or indirectly." SMC 5.30.020(G); former TMC 6.68.125 (1965). This definition is intentionally broad. *See* SMC 5.30.030(B)(5). The SMC offers several specific examples of activities considered "engaging in business," including "[s]oliciting sales," performing "warranty work," and "[m]eeting with customers or potential customers." SMC 5.30.030(B)(3)(c), (d), (l).

¶17 There is little question that Ford's activities fall within that broad classification. Ford does not dispute that it is in the business of making sales at wholesale. Ford also admits that it engages in activities within the cities that are

related to its business of making wholesale sales to dealers. Some of those activities are of the sorts offered as examples in the SMC. We conclude, therefore, that Ford was properly classified and taxed as one engaging in the business of wholesaling within the cities.

¶18 Because we conclude that the taxable incident is engaging in the business of wholesaling and the challenged ordinances are clear on that point, it does not matter in which jurisdiction the actual sales at wholesale occur. Thus, Ford's argument that the terms of its contracts control the location of the sale is misdirected. As we observe hereafter, the location where title is transferred under the terms of a contract does not determine whether a city can impose a privilege tax.

¶19 Division One of the Court of Appeals has rejected an argument similar to the one Ford advances here, in the case of *General Motors*, 107 Wn. App. 42. There, the court affirmed Seattle's imposition of the B&O tax presently before us on General Motors and the Chrysler Corporation because the companies engaged in the business of making wholesale sales within Seattle. Although neither company engaged in direct selling activities within the city, the court found that other business activities conducted by the companies "that are designed to assist the automakers in 'maintain[ing] a share of the market within the city' " were sufficient to subject them to Seattle's B&O tax. *Id.* at 48 (alteration in original) (quoting SMC 5.44.022(8)).

¶20 That decision, which we declined to review, is consistent with our decisions in *General Motors Corp. v. State*, 60 Wn.2d 862, 376 P.2d 843 (1962), *aff'd on other grounds*, 377 U.S. 436, 84 S. Ct. 1564, 12 L. Ed. 2d. 430 (1964), and *Field Enterprises, Inc. v. State*, 47 Wn.2d 852, 289 P.2d 1010 (1955). In both, as here, goods were sold by out-of-state companies to Washington buyers and shipped free on board point of shipment. We upheld the imposition of the state B&O tax in both cases, reasoning that "the substance of each transaction occurs in Washington where the customer is located." *General Motors Corp.*, 60 Wn.2d at 876. In doing

so, we rejected the argument that a contract specifying that title will transfer at a point out of state enabled the out-of-state seller to avoid the tax.

¶21 Ford cites to several cases in which courts have determined that the parties' commercial contract established where, for tax purposes, a sale is made. *See, e.g., McLeod v. J.E. Dilworth Co.*, 322 U.S. 327, 64 S. Ct. 1023, 88 L. Ed. 1304 (1944); *Weyerhaeuser Co. v. Dep't of Revenue*, 106 Wn.2d 557, 723 P.2d 1141 (1986). However, these cases are neither persuasive nor relevant to the question at hand because they concerned the propriety of state and local sales taxes. Looking at the place of sale is proper in the sales tax context because the incident of tax in that situation is the individual transaction. Such is not the case where a B&O tax is involved because, as we have observed above, the B&O tax is imposed upon activities associated with the privilege of doing business in the taxing jurisdiction.

¶22 The B&O tax levied by the cities is neither a sales tax nor a tax on the passage of title to property. Rather, the target of the tax in this instance is the privilege of engaging in the wholesale business in the cities. Thus, we affirm the trial courts' conclusions that Ford is engaged in the business of making wholesale sales and was properly classified and taxed as such.

### B. The Tax Measure

¶23 The tax measure is the amount against which the tax rate is multiplied to find the amount of tax due. The tax measure of a B&O tax on wholesaling is generally the gross proceeds of sales of tangible personal property and services rendered by the business. 1B KUNSCH ET AL., *supra*, § 72.8, at 452. As noted above, both cities' ordinances provide that the measure of their B&O tax upon wholesalers is the "the gross proceeds of such sales of the business without regard to the place of delivery of articles, commodities or merchandise sold." SMC 5.45.050(C); *see* former TMC 6.68.220. In other words, Seattle and Tacoma tax Ford

based on the gross receipts of its wholesale sales to local dealers in the respective cities.

¶24 Ford contends that this tax measure violates Washington law, the cities' ordinances themselves, and the commerce clause of the United States Constitution. Instead, Ford would have us limit the tax measure to that portion of gross income created solely by Ford's in-city activities, such as business meetings. Ford construes the law in this area to prohibit the cities from taxing income derived from such activities as design of vehicles, production, accepting dealer orders, and receiving payments. This argument too is without merit.

### 1. Validity of the tax measure under Washington law

¶25 First, Ford's argument that Washington law requires the cities to piecemeal the tax measure among all of the jurisdictions in which all of the various activities related to the sale were conducted is a clear misreading of our decision in *Lone Star Cement Corp. v. City of Seattle*, 71 Wn.2d 564, 429 P.2d 909 (1967). In *Lone Star Cement*, we struck down on equal protection and privilege and immunities grounds the city of Seattle's B&O tax assessment on an out-of-state company who had plants in both Seattle and Concrete, Washington. The city attempted to measure its B&O tax by including the gross income from sales made at the Concrete plant, even when those sales were consummated outside of Seattle and the products delivered to places outside of Seattle. We disallowed the tax assessment on the products sold in Concrete, as these sales had no connection to the company's activities in Seattle and, thus, were beyond Seattle's taxing power. We did not, however, rule that Seattle could not tax Lone Star Cement on the entire gross receipts of sales to customers within Seattle, even when the products sold were manufactured elsewhere. In fact, Lone Star Cement paid B&O taxes on those products without protest. We excluded from the measure of Seattle's B&O tax only the revenue from products manufactured, sold, and delivered outside Seattle—revenue essentially unconnected to Seattle.

¶26 This was the same type of overreaching that the United States Supreme Court disallowed in *Gwin, White & Prince, Inc. v. Henneford*, 305 U.S. 434, 59 S. Ct. 325, 83 L. Ed. 272 (1939). There, the taxpayer marketed, shipped, and sold fruit in places throughout the country, including Washington State. Washington asserted that it had the authority to measure its B&O tax on all of the business's gross receipts from interstate activities, whether conducted inside or outside of Washington. The United States Supreme Court invalidated Washington's tax because it was not apportioned to the activities within the state, but rather was impermissibly based upon the *entire volume of interstate commerce* in which the taxpayer participated.

¶27 Clearly, such is not the scenario here. By their very terms, the cities' ordinances limit their taxing power to only those gross receipts derived from the sale of goods delivered into the cities. This places the cities' tax measure squarely within the boundaries allowed under *Lone Star Cement* and *Gwin, White & Prince*. The measure of tax would be invalid if it included all gross income earned by Ford on its interstate sales or even if it included gross income derived from sales made in other areas of this state. However, that is not the case with which we are presented. In this case, the cities properly limited their tax measure to only those sales that were connected to Ford's business activities in their respective jurisdictions.

2. Validity of the tax measure under the cities' ordinances and tax rules

¶28 Second, the ordinances themselves are no more restrictive than Washington law requires. Ford is correct that under the terms of its own ordinances, the cities may only measure the B&O tax based upon gross income derived from Ford's business activities in the cities. SMC 5.45.080(B) provides that the taxpayer shall allocate to the city "that portion of the taxpayer's gross income or gross proceeds of sales that are derived from business activities performed in the city." Former TMC 6.68.220(B) requires

the taxpayer engaged in the business of making sales at wholesale to pay tax on an amount "equal to the gross proceeds of sales of such business."

¶29 However, Ford is not correct that the cities have gone beyond permissible bounds in their application of the ordinances. The language Ford construes as restraining the cities' power to reach any of Ford's interstate sales instead is merely designed to contain the measure of the tax within permissible bounds. Ford admits that it can be taxed on "income derived from activities performed within the city." Appellant's Br. of Ford Motor Co. at 20. Revenue from sales to dealers in Seattle and Tacoma is *derived* from Ford's activities in the cities because those activities create the opportunity for the sales.

¶30 Neither do the cities' tax rules exclude all of Ford's interstate sales from the tax measure. Tacoma Tax Rule 103, defining where a sale is deemed to have occurred, is irrelevant in the present case, because B&O taxes do not depend upon where actual sales occur. Tacoma Tax Rule 103 (on file with Tacoma Fin. Dep't, Tax & License Div.). Another Tacoma Tax Rule, 193-A, excludes certain goods delivered to a purchaser "at a point outside the state" from wholesaling business taxes. Def.'s Ex. 28, at 769. However, this rule applies only when the goods originated in Tacoma and were sold to purchasers who were located in other cities or states. Wholesaling is considered a unitary activity occurring solely in the purchaser's jurisdiction, the jurisdiction to which the goods are physically delivered. *Tyler Pipe Indus., Inc. v. Wash. State Dep't of Revenue*, 483 U.S. 232, 251, 107 S. Ct. 2810, 97 L. Ed. 2d 199 (1987). Thus, when goods are sold by a wholesaler in Tacoma but delivered to a dealer who is outside of Tacoma, the sale at wholesale is considered to have been made entirely in the dealer's jurisdiction, so Tacoma cannot tax it. Tacoma Tax Rule 193-A simply states this rule. Like the ordinances themselves, it restrains the tax measure to permissible bounds.

¶31 The dissent asserts that one of Seattle's tax rules limits the wholesaling tax to people actually selling goods

within Seattle. Dissent at 61-62. We disagree. Seattle Business Tax Rule 5-44-194(2)(a) provides in part: "Any person(s) who sells or leases personal property to buyers or lessees within the City are taxable under the retailing or wholesaling tax classification . . . ." SEATTLE BUS. TAX RULE 5-44-194 (on file with Seattle City Clerk). The words "within the City" follow the phrase "buyers or lessees," not the phrase "sells or leases," which tends to indicate that "within the City" modifies the nouns "buyers" and "lessees." If the city of Seattle instead wanted these words to modify the verb "sells," it could have phrased the rule differently, as it did in the very ordinance at issue here; in SMC 5.45.050(C), "within the City" immediately follows the verb "engaging." Thus, it would appear that Seattle Business Tax Rule 5-44-194 was not intended to limit wholesaling taxes to people who sell within Seattle, but rather, to people who sell goods to *purchasers* who are located within Seattle. Like Tacoma's tax rules, this comports with the rule that wholesaling is deemed to occur entirely within the purchaser's jurisdiction.

3. Validity of the tax measure under the commerce clause

¶32 Finally, we reach Ford's argument that the current tax measure unduly burdens interstate commerce and, thus, violates the commerce clause of the United States Constitution.[3] A state tax on interstate commerce does not violate the commerce clause so long as "the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977). If a local taxing scheme fails any one of these four requirements, it is invalid. However, it has long been recognized that it is " 'not the purpose of the commerce

---

[3] U.S. CONST. art. I, § 8, cl. 3.

clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business.'" *Gen. Motors Corp. v. Washington*, 377 U.S. 436, 439, 84 S. Ct. 1564, 12 L. Ed. 2d 430 (1964) (quoting *W. Live Stock v. Bureau of Revenue*, 303 U.S. 250, 254, 58 S. Ct. 546, 82 L. Ed. 823 (1938)), *overruled on other grounds by Tyler Pipe*, 483 U.S. 232. Ford does not challenge that their activities within the cities satisfy the "substantial nexus" prong of the *Complete Auto Transit* test. *See* Appellant's Br. of Ford Motor Co. at 8. Thus, we address only the remaining three requirements.[4]

¶33 The fair apportionment prong ensures that each State taxes only its fair share of an interstate transaction. *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 184-85, 115 S. Ct. 1331, 131 L. Ed. 2d 261 (1995). The prong has two parts: the tax must be internally consistent and externally consistent. "Internal consistency is preserved when the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear." *Id.* at 185. External consistency depends on the practical effect of a tax, existing where a tax is economically justified, such that it does not "reach[ ] beyond that portion of value that is fairly attributable to economic activity within the taxing State." *Id.* Where a state tax (or local tax, as here) creates "the threat of real multiple taxation (though not by literally identical statutes)," the tax is externally inconsistent. *Id.* Ford contends that the cities' B&O tax, as applied to Ford, is not fairly apportioned because it violates both the internal and external consistency tests.

---

[4] The city of Seattle claims that Ford challenges the third and fourth prongs of the *Complete Auto Transit* test for the first time on appeal, making the challenge untimely. Ford disputes the city's allegation. We note that even if this claim is true, RAP 2.5(a) does not prevent us from reviewing these issues on appeal but merely allows us discretion to refuse review. Because Ford did raise a commerce claim challenge below, and in the interests of fully resolving that challenge, we address the third and fourth prongs along with the second.

¶34 The cities point out that this challenge has been settled previously and adversely to Ford. The cities are correct. In *General Motors*, 107 Wn. App. at 55-60, the Court of Appeals, Division One, explicitly held that Seattle's B&O tax is fairly apportioned. The Court of Appeals determined that Seattle's B&O tax on wholesaling is internally consistent because the measure of the tax includes only wholesale sales of goods delivered to Seattle, thereby preventing the possibility that the out-of-state automakers could be subjected to the identical tax in another state for the same vehicles and parts. The court also determined that Seattle's B&O tax was externally consistent because there was no evident danger of multiple taxation by outside jurisdictions and because a tax on the gross receipts of wholesaling activities is inherently apportioned. In reaching this conclusion, the court relied on the United States Supreme Court's decision in *Tyler Pipe*, 483 U.S. 232.

¶35 In *Tyler Pipe*, the United States Supreme Court rejected appellant Tyler Pipe's apportionment challenge to Washington State's B&O tax, concluding that "the activity of wholesaling—whether by an in-state or an out-of-state manufacturer—must be viewed as a separate activity conducted wholly within Washington that no other State has jurisdiction to tax." *Tyler Pipe*, 483 U.S. at 251. The Court noted that Washington's B&O tax on interstate sales by out-of-state manufacturers, which is measured by the gross proceeds of sales to Washington buyers, was " 'apportioned exactly to the activities taxed,' " even though part of the value of the wholesale transaction was "attributable to manufacturing activity carried on in another State." *Id.* (quoting in part *Standard Pressed Steel Co. v. Dep't of Revenue*, 419 U.S. 560, 564, 95 S. Ct. 706, 42 L. Ed. 2d 719 (1975)).

¶36 The cities' wholesale B&O taxes are very similar in the relevant aspects to the state statute at issue in *Tyler Pipe*. The cities' privilege tax is measured by the gross proceeds of all sales to buyers within the taxing jurisdiction. Sales at wholesale to these buyers is an activity

separate from manufacturing, design, and the like, which under *Tyler Pipe* must be considered conducted entirely within the destination city. Because of this, no other state or jurisdiction within Washington can tax it. Ford faces no practical threat of multiple taxation due to the cities' B&O taxes, so the ordinances are externally consistent. Even if the same ordinance were put into effect in every city across the nation, Ford would face no additional taxation as a result of being engaged in interstate commerce, so the ordinances are internally consistent. We conclude that the cities' B&O taxes on wholesaling are, like the virtually identical Washington State statute, apportioned exactly to the activities taxed.

¶37 Ford relies primarily on a California case, a Pennsylvania Supreme Court case, and the United States Supreme Court's decision in *Jefferson Lines* to support its apportionment challenge. However, we find none of these cases persuasive.

¶38 In *General Motors Corp. v. City of Los Angeles*, 5 Cal. 3d 229, 486 P.2d 163, 95 Cal. Rptr. 635 (1971), the California Supreme Court applied California constitutional provisions and the equal protection clause of the federal constitution to business privilege taxes on products manufactured and sold within the state of California. Since interstate commerce was not involved, the court was not required to examine the validity of the gross receipts tax under the commerce clause of the United States Constitution. Thus, the California holding is inapplicable in the instant case.

¶39 The Pennsylvania case actually contradicts Ford's argument. While the Pennsylvania Supreme Court did limit the reach of Philadelphia's business privilege tax on *services* to receipts from services performed in the city, it recognized and emphasized that in levying a gross receipts tax on activities involving *manufacturing and sales*, "the state of origin can tax the manufacturing activity, and the state of destination can tax the selling activity," without requiring apportionment. *Phila. Eagles Football Club, Inc.*

*v. City of Philadelphia*, 573 Pa. 189, 823 A.2d 108, 129 (2003).

¶40 Finally, this court has previously rejected the argument that *Jefferson Lines* somehow required us to revisit and overturn *Tyler Pipe*'s holding. *W.R. Grace & Co. v. Dep't of Revenue*, 137 Wn.2d 580, 597, 973 P.2d 1011 (1999). In *W.R. Grace*, we reaffirmed that the measure of our state's B&O tax on engaging in wholesaling activities is fairly apportioned and constitutional. In sum, none of the cases relied upon by Ford put into doubt Seattle's constitutional ability to measure its tax by the entire gross proceeds of sales to dealers located in Seattle.

¶41 A tax violates the third prong of the *Complete Auto Transit* test only if it treats interstate and intrastate commerce differently. *Chi. Bridge & Iron Co. v. Dep't of Revenue*, 98 Wn.2d 814, 830, 659 P.2d 463 (1983). Ford argues the cities' B&O taxes are discriminatory because they are not fairly apportioned. This argument fails for two reasons. First, we have already determined that the cities' B&O tax schemes do not run afoul of *Complete Auto Transit*'s fair apportionment requirement. Second, Ford confuses the third prong of the test with the second. The antidiscrimination prong is not about apportionment, but rather about whether a transaction is taxed more heavily because it crosses state lines.

¶42 The taxpayers in *Chicago Bridge & Iron* raised a third prong challenge to the State's B&O tax. We rejected their argument, noting that Washington's tax scheme treats interstate and intrastate business equally, making no distinction between them. We concluded that under the state statute, both in-state and out-of-state wholesalers are taxed only once on their gross proceeds based on sales made within Washington.

¶43 So it is with the cities' B&O tax scheme. The cities' tax scheme only taxes the gross proceeds derived from sales made and delivered to their respective jurisdictions. Their tax measure includes receipts from all products delivered into the jurisdiction, regardless of the place of origin. The

fact that Ford may be taxed on manufacturing by the state where its products are manufactured, as well as taxed by Washington State and one of the cities, does not constitute discrimination against interstate commerce and does not present grounds for this court to declare the cities' B&O tax scheme unconstitutional. *Accord Am. Nat'l Can Corp. v. Dep't of Revenue,* 114 Wn.2d 236, 241-46, 787 P.2d 545 (1990). We find that, like Washington State, the cities impose their B&O wholesaling taxes equally upon interstate and intrastate business, making no distinction between them.

¶44 A tax violates the fourth prong of the *Complete Auto Transit* test only if the measure of the tax "bears no relationship to the taxpayers' presence or activities in a State." *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 629, 101 S. Ct. 2946, 69 L. Ed. 2d 884 (1981). We noted in *Chicago Bridge & Iron* that this prong "is easily met." *Chi. Bridge & Iron,* 98 Wn.2d at 832. This fourth requirement "does not address the rate or amount of the tax." *Id.* Nor does it require, as Ford asserts, that we compare the actual value of the services provided by the cities with the income taxed. Instead, the fourth prong is tied to the first, nexus, and requires that the tax measure, as well as the tax incident, be " ' "tied to the earnings which the State . . . has made possible" '. " *Id.* (alteration in original) (quoting *Commonwealth Edison,* 453 U.S. at 626 (quoting *Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 446, 61 S. Ct. 246, 85 L. Ed. 267 (1940))).

¶45 In *Chicago Bridge & Iron,* we concluded that although the taxpayer formalized its construction contracts outside the state, its presence and activities in Washington were fairly related to the services provided by the State. In reaching our decision, we looked at the taxpayer's specific activities in Washington, such as maintaining an office and selling products to consumers here, and at the services provided by the State broadly, such as "police and fire protection, the presence of a trained work force, and the general 'advantages [accorded to the taxpayer] of a civilized

society.' " *Id.* at 832 (quoting *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 445, 99 S. Ct. 1813, 60 L. Ed. 2d 336 (1979)).

¶46 This prong is also easily satisfied in this case. In addition to Ford's meetings with its dealers within the limits of the cities, Ford's presence in the cities allows for its products to be delivered to, marketed, and sold in the cities—activities that clearly bear a relationship to the gross proceeds it receives from area dealers. Furthermore, as in *Chicago Bridge & Iron,* the cities more broadly provide Ford with an orderly and civilized place to conduct its business activities.

¶47 In sum, there is no authority that supports Ford's assertion that the tax measure imposed on the activity of wholesaling must be broken down and apportioned to the places where each discrete step in the wholesaling process is conducted. Both Washington law and holdings of the United States Supreme Court treat wholesaling as a single, unitary activity, separate from the manufacturing and design processes. Accordingly, a long line of precedent sanctions using the gross proceeds from wholesale sales delivered into a jurisdiction as the measure of a B&O tax, when the taxpayer is engaged in the business of fostering wholesale sales within the taxing jurisdiction. The cities' B&O tax measure is in accordance with this jurisprudence. Furthermore, because the cities' B&O tax scheme meets all four requirements of the *Complete Auto Transit* test, we find that it does not violate the federal commerce clause. The fact that some portions of the wholesaling process take place outside of the taxing jurisdiction is not controlling and does not, as Ford asserts, require the cities to exclude such activities from the tax measure.

### III

¶48 Ford also challenges the city of Tacoma's assessment of taxes from 1994 through 1999, claiming it is barred by the statute of limitations. Ford claims, additionally, that it was never properly assessed. We reject both of these claims.

¶49 Tacoma assessed Ford in 2004. At that time, Tacoma's statute of limitations prohibited collection of taxes "more than four years after the close of the calendar year in which they were due." Former TMC 6.01.090(3)(2002).[5] However, the same ordinance provided two exceptions to the four-year limitation: (1) when a taxpayer was not registered to do business in the city at the time of assessment and (2) when a taxpayer had not filed a tax return for the periods at issue. In either of these cases, taxes could be collected for the 10 years prior.

¶50 It is not disputed that Ford was registered at the time the assessment was issued in 2004. Thus, only the second exception is at issue here. The TMC does not define what constitutes a tax return. State law defines a tax return as "a tax or information return . . . required by, or provided for or permitted under, the laws of this state which is filed with the department of revenue." RCW 82.32.330(1)(b). Federal courts have interpreted a tax return to be a document that "contains financial data . . . which would allow for a computation" of the appropriate tax. *Hess v. United States*, 785 F. Supp. 137, 138-39 (E.D. Wash. 1991) (citing *United States v. Long*, 618 F.2d 74 (9th Cir. 1980)).

¶51 Ford acknowledges it did not file a formal tax return. However, Ford argues that because it registered as a business in 2000 and back-paid the license fees for the years 1994-99 at that time, it filed a return for those years. Essentially, Ford asks us to consider its business license applications to constitute tax return because the applications require a minimal amount of financial data and payment of a fee.

---

[5] In relevant part, former TMC 6.01.090(3) provides:

"(3) The Director shall not assess . . . additional taxes . . . due more than four years after the close of the calendar year in which they were due, except . . . ;

"(a) Against a person who is not currently registered or has not filed a tax return as required by this chapter for taxes due within the period commencing ten years prior to the close of the calendar year in which the person was contacted in writing by the Director . . . ."

¶52 Ford's argument fails for three reasons. First, the annual business license application is exactly that—a license application, not a return. It is designed to license a company to engage in business, not to provide financial information for taxation purposes. Second, although the license applications may request some financial data, they do not require the provision of sufficient financial data to allow for a computation of the appropriate tax. Third, even if the license applications could be considered returns, Ford failed to file them until 2000. Had Ford filed them in the years they were due, Tacoma might have known to request tax returns and payment of taxes at that time. However, Ford failed to provide such notice of its business activities in a timely manner. Its belated filing of license applications cannot now be used to avoid paying its fair share of the tax burden to Tacoma. We affirm the trial court's conclusion that Ford did not file valid tax returns for the 1994-99 tax period, allowing the city of Tacoma to collect taxes owed for those years.

¶53 Ford goes on to allege that it was not properly assessed. Generally, when a tax assessment is challenged, courts will presume that the assessor has performed his or her duties properly and fairly and require the taxpayer to shoulder the burden of proving otherwise. 72 AM. JUR. 2D *State and Local Taxation* § 637 (2001); *Nathan v. Spokane County*, 35 Wash. 26, 34, 76 P. 521 (1904). We give great deference to the trial court's weighing of evidence. Our review, in such cases, "is limited to determining whether substantial evidence supports the findings" and conclusions of the trial court. *Org. to Pres. Agric. Lands v. Adams County*, 128 Wn.2d 869, 882, 913 P.2d 793 (1996) (citing *Ridgeview Props. v. Starbuck*, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982)). " 'Substantial evidence' exists when there is a sufficient quantum of proof to support the trial court's findings of fact." *Id.* (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973)).

¶54 The Pierce County Superior Court concluded that Ford failed to meet its burden of proof on this chal-

lenge, finding the two field reports issued by Tacoma in April 2004 to have been valid tax assessments. There is evidence to support the superior court's conclusion on this issue. The field reports were mailed to Ford, identified the years for which tax was due, and stated the specific amount owing. The reports evidently provided adequate notice to Ford of its obligations, since Ford subsequently paid the assessed amount and filed a lawsuit challenging it. Furthermore, the superior court heard evidence of the city of Tacoma's procedures in assessing taxes, the degree to which the reports given complied with their usual form of notice, and computer issues the city was having at that time. We will not engage in a reweighing of this evidence, particularly in light of the fact that the Ninth Circuit Court of Appeals has previously concluded, "The form on which a notice of assessment and demand for payment is made is irrelevant as long as it provides the taxpayer with all the information required," providing adequate notice that taxes are due. *Elias v. Connett*, 908 F.2d 521, 525 (9th Cir. 1990); *see also Hughes v. United States,* 953 F.2d 531, 536 (9th Cir. 1992).

¶55  Similarly, we will not reweigh the evidence on the authority of the auditor to make the assessment, as Ford asks us to do. The superior court concluded that the auditor who conducted Ford's audit was acting under the authority of the director of finance. The TMC provides that the director of finance shall audit and assess the taxpayer. *See, e.g.*, former TMC 6.01.090(3). It also provides that the term "[d]irector means the director of finance or any city officer designated by him to act on his behalf. Former TMC 6.68.023 (1991). The trial court determined that the senior auditor who carried out the audit was acting as a duly authorized designee of the director of finance. This finding is supported by the record.

## IV

¶56  The B&O tax levied by the cities is neither a sales tax nor a tax on the passage of title to property. Rather, its

tax incident is engaging in the wholesale business in the cities of Seattle and Tacoma. Ford's activities conducted in the cities fall within this definition. Thus, we affirm the trial courts' conclusions that Ford is engaged in the business of making wholesale sales and was properly classified and taxed as such.

¶57 Ford's apportionment and commerce clause challenges to the measure of the B&O tax are governed by settled Washington and United States Supreme Court law. A long line of precedent upholds the gross proceeds of sales at wholesale that derive from activities within the taxing jurisdiction as a valid and constitutional measure for a B&O tax on wholesaling. Ford does not present sufficient grounds for departing from the reasoning and application of those opinions. Thus, we also affirm the trial courts' conclusions that the measure of the Cities' B&O tax is fairly apportioned and does not violate the federal commerce clause.

¶58 Finally, we find the Pierce County Superior Court's challenged findings of fact and conclusions of law to be supported by substantial evidence. We uphold its determination that Tacoma's assessment was valid and Tacoma may collect B&O taxes from the 1994-99 period.

¶59 Accordingly, we affirm both trial courts.

MADSEN, BRIDGE, OWENS, and FAIRHURST, JJ., concur.

¶60 SANDERS, J. (dissenting) — Today's holding allows city of Seattle and city of Tacoma to reach two thousand miles beyond their borders to tax automobile sales made in Dearborn, Michigan. Ford admits it engages in some business activities in both Seattle and Tacoma, however, argues it is beyond either city's taxing power to tax sales completed outside their jurisdictions.

¶61 Title, ownership, and possession of all Ford's vehicles transfer to the local dealerships when Ford delivers the vehicles to a common carrier at its factory in Michigan.

The majority conveniently ignores this fact, claiming it is only necessary to find Ford engaged in some business activities here. I disagree. We must follow the plain meaning of both cities' taxing ordinances to hold sales in Michigan are not taxable under these ordinances, although other business activity which occurs within the municipal jurisdictions may be. Moreover any attempt by a municipality to tax an out-of-state sale would violate the commerce clause.

I. The cities' ordinances do not allow taxation of out-of-state sales

¶62 Both cities have a tax scheme that provides different tax rates based upon different activities. Two classifications possibly apply: Seattle Municipal Code (SMC) 5.45.050(C) and former Tacoma Municipal Code (TMC) 6.68.220(B) (1998) applied to every person in the business of making sales at wholesale within the city,[6] while SMC 5.45.050(F) and former TMC 6.68.220(F) are catchall subsections that applied to all other activities not specifically listed in the respective ordinance. The majority claims the former classification applies. But this section applies to wholesale sales made only *within the city*. Both cities define a "sale" as transferring property's ownership or title for valuable consideration. SMC 5.30.050; former TMC 6.68.050 (1978).[7]

¶63 We apply the same rules of statutory construction to ordinances as we do statutes. *Kitsap County v. Mattress Outlet*, 153 Wn.2d 506, 509, 104 P.3d 1280 (2005). And unambiguous ordinances must be applied by their plain meaning. *State v. Villarreal*, 97 Wn. App. 636, 641-42, 984 P.2d 1064 (1999). There is nothing ambiguous about these

---

[6] In addition to SMC 5.45.050 and former TMC 6.68.220, former SMC 5.44.400 (1996) applied before 2002, though there is no material difference between the ordinances for our purposes.

[7] Additionally, Seattle defines a "sale" as transferring possession of property for valuable consideration. SMC 5.30.050. Before January 1, 2002, however, Seattle defined a "sale" as "the exchange of property as well as the sale thereof for money . . . and any other contract under which possession of the property is given to the purchaser but title is retained by the vendor as security for the payment of the purchase price." Former SMC 5.44.026(1) (1996). According to all relevant definitions of "sale," Ford sold the vehicles to local dealerships in Michigan.

ordinances. Seattle and Tacoma both seek to tax Ford's wholesale sales, but these sales occurred outside both cities. A sale occurs where delivery takes place: "a sale takes place in this city when the goods sold are delivered to the buyer in this city . . . ." Clerk's Papers (CP) (Tacoma) at 767 (Tacoma Tax Rule 103, Def.'s Ex. 28); *see also* WAC 458-20-103. To determine where delivery occurs, we must look to the parties' contract and the relevant statutory law.

¶64 According to the contract, title is transferred when Ford delivers the vehicles to a carrier in Michigan. " 'Delivery' means the act of transferring possession of tangible personal property." CP (Seattle) at 112 (Seattle Business Tax Rule 5-44-193A(2)(c));[8] *see also* CP (Tacoma) at 769 (Tacoma Tax Rule 193-A, Def.'s Ex. 29); *see also* U.C.C. § 2-103(e) (2004) (defining "delivery" as "the voluntary transfer of physical possession or control of goods"). Ford's shipment contract specified the vehicles were released at the gate when they were transferred to the carrier. This is a standard FOB (free on board) point of shipment contract. Under RCW 62A.2-504, goods are delivered when the seller ships the goods. Specifically, the seller must:

> (a) put the goods in the possession of such a carrier and make such a contract for their transportation as may be reasonable having regard to the nature of the goods and other circumstances of the case; and
>
> (b) obtain and promptly deliver or tender in due form any document necessary to enable the buyer to obtain possession of the goods or otherwise required by the agreement or by usage of trade; and
>
> (c) promptly notify the buyer of the shipment.

*Id.*; U.C.C. § 2-504 cmt. 1 ("The general principles embodied in this section cover the special cases of F.O.B. point of

---

[8] Delivery "includes among others the transfer of goods from consignor to freight forwarder or for-hire carrier, from freight forwarder to for-hire carrier, from one for-hire carrier to another, or from the for-hire carrier to consignee." Seattle Business Tax Rule 5-44-193A(2)(c); *see also* CP (Tacoma) at 769 (Tacoma Tax Rule 193-A). Therefore, Ford completed delivery to the dealerships when it transferred the vehicles to a for-hire carrier.

shipment contracts . . . ."); *see also* RCW 62A.2-308 (unless otherwise specified "the place for delivery of goods is the seller's place of business"). These requirements were met in Michigan when vehicles were sent to "Gate Release." CP (Tacoma) at 106-07 (Stipulation of Facts). Once building and testing is complete, a third party carrier inspects the vehicles, then transports them from the factory to a "drop zone," where Ford scans and releases each vehicle at exit (gate release). *Id.* At gate release, Ford transfers title to the dealer, retaining only a security interest in the vehicle until full payment is made. *Id.* At that point Ford has voluntarily transferred physical possession of the goods; delivery has been made, and Ford is no longer responsible for the goods.[9]

¶65 While the majority disregards these facts and claims Ford is asking us to construe these ordinances narrowly, majority at 41, Ford is only asking we apply their plain meaning. "Any doubts as to the meaning of a statute under which a tax is sought to be imposed will be 'construed against the taxing power.'" *Weyerhaeuser Co. v. Dep't of Revenue*, 106 Wn.2d 557, 566, 723 P.2d 1141 (1986) (quoting *Duwamish Warehouse Co. v. Hoppe*, 102 Wn.2d 249, 254, 684 P.2d 703 (1984); *MAC Amusement Co. v. Dep't of Revenue*, 95 Wn.2d 963, 966, 633 P.2d 68 (1981)). The majority reads the cities' ordinances to allow a city to tax any business that engages in any activity that eventually leads to making sales, even when those sales occur outside the city. Majority at 42.

¶66 The majority also ignores the cities' own rules. "Aside from the constitutional limitations of the State's power to tax, [a city] is bound by the explicit provisions of

---

[9] Seattle suggests Ford was still responsible because a buyer could reject the goods at its store in the city. This statement confuses two issues. Under RCW 62A.2-509(1)(a), "the risk of loss passes to the buyer when the goods are duly delivered to the carrier." If damage occurred during transit, Ford was not primarily liable. Of course, the perfect tender rule still applied; if Ford's shipments did not conform to the contract, then the dealership could have rejected the goods. This does not implicate Ford's delivery of the vehicles—that clearly occurred in Michigan.

its own rules." *City of Tacoma v. Gen. Metals of Tacoma, Inc.*, 84 Wn.2d 560, 564, 527 P.2d 1314 (1974). Tacoma Tax Rule 193-A provides: "Where the seller agrees to and does deliver the goods to the purchaser at a point outside the state, neither Retailing nor Wholesaling business tax is applicable."[10] CP (Tacoma) at 769; *see also* CP (Tacoma) at 767 (Tacoma Tax Rule 103) ("For the purpose of determining tax liability, . . . a sale takes place in this city when the goods sold are delivered to the buyer in this city . . . ."); *see also* WAC 458-20-103 ("For the purpose of determining tax liability, . . . a sale takes place in this state when the goods sold are delivered to the buyer in this state . . . ."). Additionally, Seattle Business Tax Rule 5-44-194 provides, "Any person(s) *who sells* or leases personal property to buyers or lessees *within the City* are taxable under the retailing or wholesaling tax classification . . . ." CP (Seattle) at 120. Ford never sold any vehicles within Seattle and should not be taxed under the wholesaling tax classification.

¶67 The majority relies on a Court of Appeals decision in *General Motors Corp. v. City of Seattle*, 107 Wn. App. 42, 25 P.3d 1022 (2001) for support. But there General Motors (GM) and Chrysler argued "they [did] not engage in business activities." *Id.* at 48. And here Ford wisely admits it did engage in business activities. GM and Chrysler, like Ford, also shipped the vehicles "fob factory via common carrier." *Id.* at 46 (footnote omitted). The *General Motors* court found there was a sufficient nexus between the companies' activities in Washington and the B&O tax. *Id.* at 53. But because neither GM nor Chrysler made sales in Seattle, the court said: "Although they may not be characterized as direct selling activities, they nevertheless consti-

---

[10] In its petition for review, Ford neglects to inform this court the relevant language is found in Tacoma Tax Rule 193-A, which applies to "SALES OF GOODS ORIGINATING IN TACOMA TO PERSONS IN OTHER STATES, CITIES, AND COUNTIES." CP (Tacoma) at 769. Nevertheless, the language evidences Tacoma's limitations on taxing goods delivered beyond its border. Additionally, part A provides that the place of delivery is determined by the parties' contract and when a common carrier takes charge of the goods.

tute 'other business activities' . . . ." *Id.* at 48. Similarly, Ford's "other business activities" may be taxed, but sales made in Michigan are beyond the purview of either city's taxing power.

## II. Taxing out-of-state sales violates the commerce clause

¶68 The commerce clause grants the United States Congress the power to "regulate commerce with foreign nations, and among the several states, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The negative implication of this power prohibits a state (or city) from passing legislation that improperly burdens interstate commerce. *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179, 115 S. Ct. 1331, 131 L. Ed. 2d 261 (1995) ("[W]e have consistently held [the commerce clause] to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state taxation even when Congress has failed to legislate on the subject."). Therefore, a local tax is valid only "when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977).

¶69 Each city's tax is measured by gross proceeds of out-of-state sales and therefore does not apportion the activities taxed. *See Standard Pressed Steel Co. v. Dep't of Revenue*, 419 U.S. 560, 564, 95 S. Ct. 706, 42 L. Ed. 2d 719 (1975); *Gwin, White & Prince, Inc. v. Henneford*, 305 U.S. 434, 440, 59 S. Ct. 325, 83 L. Ed. 272 (1939) ("Although the tax, measured by gross receipts, to some extent burdened the commerce, it was held that the burden did not infringe the commerce clause. Since it was apportioned exactly to the activities taxed, all of which were intrastate, the tax was fairly measured by the value of the local privilege or franchise."). No matter the trigger—be it engaging in business activities leading to making sales or making the sales themselves—each city nevertheless is not apportioning its

respective tax between activity inside its jurisdiction and activity outside. Rather, each city is taxing 100 percent of sales that occur outside its jurisdiction in violation of the commerce clause. *ASARCO, Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 315, 102 S. Ct. 3103, 73 L. Ed. 2d 787 (1982) ("As a general principle, a State may not tax value earned outside its borders.").

¶70 In *Tyler Pipe*, the United States Supreme Court found "the activities of Tyler's sales representatives adequately support the State's jurisdiction to impose its wholesale tax on Tyler." *Tyler Pipe Indus., Inc. v. Wash. State Dep't of Revenue*, 483 U.S. 232, 251, 107 S. Ct. 2810, 97 L. Ed. 2d 199 (1987). But unlike Ford, Tyler Pipe sold its products in Washington. And while Tyler Pipe's activities could be taxed, the Court was careful to note the constitutional limitations on imposing a wholesale tax:

> Thus, the activity of wholesaling—whether by an in-state or an out-of-state manufacturer—must be viewed as a separate activity conducted wholly within Washington that no other State has jurisdiction to tax.

*Id.* at 251. Clearly, Ford's wholesaling activities were not conducted wholly within Washington; its vehicles were sold in Michigan—title, ownership, and possession are transferred when Ford delivers the vehicles to a common carrier at its factory in Michigan.

¶71 The cities' tax on sales made in Michigan also burdens interstate commerce because of the threat of double taxation. The Supreme Court has said there is a risk of double taxation "whenever one State's act of overreaching combines with the possibility that another State will claim its fair share of the value taxed." *Jefferson Lines*, 514 U.S. at 184. For example, the Supreme Court has found that when "[a] substantial part of [the taxed activity] is outside the state . . . , the tax, though nominally imposed upon appellant's activities in Washington, by the very method of its measurement reaches the entire interstate commerce service rendered both within and without the

state . . . ." *Gwin, White, & Prince*, 305 U.S. at 438; *see also Gen. Motors Corp. v. City of Los Angeles*, 5 Cal. 3d 229, 241, 486 P.2d 163, 171, 95 Cal. Rptr. 635 (1971) ("The gross receipts arising from this category of transactions must be apportioned in a manner which fairly reflects the proportion of in-city to out-of-city selling activities.").

¶72 Here the vehicles were made and sold in Dearborn, Michigan. Michigan may tax these sales. *Jefferson Lines*, 514 U.S. at 184 ("It has long been settled that a sale of tangible goods has a sufficient nexus to the State in which the sale is consummated to be treated as a local transaction taxable by that State."). Consequently, when cities in Washington tax these sales, it impermissibly burdens interstate commerce.

¶73 While Ford engages in some business activities within Seattle and Tacoma, its vehicles were sold in Michigan. Under the plain meaning of both cities' ordinances, neither Seattle nor Tacoma is allowed to tax sales in Michigan. Furthermore, allowing this tax clearly violates the dormant commerce clause as it taxes extraterritorial activities and threatens double taxation.

¶74 I dissent.

C. JOHNSON, CHAMBERS, and J.M. JOHNSON, JJ., concur with SANDERS, J.

Reconsideration denied August 6, 2007.