[No. 60301-9-I. Division One. July 21, 2008.]

GROUP HEALTH COOPERATIVE, *Respondent*, v. THE CITY OF SEATTLE, *Appellant.*

82

*Thomas A. Carr, City Attorney*, and *Kent C. Meyer, Assistant*, for appellant.

*Robert L. Mahon III* and *Gregg D. Barton* (of *Perkins Coie, LLP*), for respondent.

*Kristopher I. Tefft* on behalf of Association of Washington Business, amicus curiae.

*Daniel B. Heid* on behalf of Washington State Association of Municipal Attorneys and Association of Washington Cities, amici curiae.

¶1 DWYER, A.C.J. — Group Health Cooperative is a state-licensed health maintenance organization (HMO). It alleges that the city of Seattle (City) wrongly assessed business and occupation (B&O) taxes against health care

premium payments made to it by its customers, as well as against premium payments made by the federal government from the Federal Employee Health Benefits Fund (FEHBF). A controlling statute, RCW 48.14.0201(7), precludes Washington municipalities from assessing local taxes on health care premium payments made to HMOs. Similarly, the Federal Employee Health Benefits Act (FEHBA), 5 U.S.C. §§ 8901-8914, bars local government taxation of payments made to HMOs out of the FEHBF. 5 U.S.C. § 8909(f)(1). The trial court ruled that the City wrongly assessed B&O taxes against both health care premium payments and payments from the FEHBF. The City appeals this ruling. In addition, Group Health cross-appeals, alleging that the trial court erred by ruling that the City was not entirely barred from assessing B&O taxes after 2004. This preclusion arises, according to Group Health, as a result of the inclusion of flawed interest provisions in the model B&O tax ordinance adopted by the City, as mandated by the legislature. We affirm the trial court in all respects.

I

¶2 Group Health is a nonprofit corporation licensed to operate as an HMO in Washington. Its headquarters are in Seattle. It sells a variety of health care benefit plans in exchange for health care premium payments. Individuals enrolled in Group Health's benefit plans are entitled to receive some health care services at Group Health's facilities, including those in Seattle. Premiums charged by Group Health to federal employees with employer-provided health insurance are paid by the federal government from the FEHBF.

¶3 Depending on the extent of an individual's health care coverage under a Group Health benefit plan, the individual may have to pay Group Health additional co-payments, deductibles, or coinsurance payments. If individuals who are not enrolled in a Group Health benefit plan

seek care at a Group Health facility, Group Health directly charges them (or their health insurer, if they have one) fees for the health care services provided. Thus, Group Health has two revenue streams—revenue it receives from enrollees in the form of premium payments (premium revenue) and revenue it receives as direct fees for services provided that fall outside the coverage of a benefit plan (service revenue).

¶4 The State of Washington taxes the premium revenue of health insurers and HMOs at a rate of two percent. RCW 48.14.0201(1), (2). Federal law, however, bars states (and municipalities) from taxing payments made from the FEHBF. 5 U.S.C. § 8909(f)(1). The State also imposes its own B&O tax "for the act or privilege of engaging in business activities" in the state, RCW 82.04.220, including the provision of health care services, at a rate of one and one-half percent. RCW 82.04.290(2). The State classifies Group Health's premium revenue as taxable pursuant to the state premium tax statute and Group Health's service revenue as taxable pursuant to the state B&O tax statute. There is no overlap.

¶5 Between January 1, 2000, and December 31, 2004, Group Health reported and paid to the State the premium tax imposed on its premium revenue (except for those revenues exempt from state or local taxation either because of federal law or for other reasons). It also reported and paid the state B&O tax on its service revenue. During this period, Group Health also paid a B&O tax to the City.

¶6 This is the tax that is at issue in this case. On August 30, 2004, Group Health filed a petition with the City requesting a refund of B&O taxes it paid to the City between January 1, 2000, and December 31, 2004. The basis for this refund request was Group Health's contention that the City had assessed B&O taxes on premium revenue and that, "beginning on January 1, 2000, business license tax does not apply to any health maintenance organization in respect to premiums or prepayments that are taxable under Revised Code of Washington (RCW) 48.14.0201."

Group Health also claimed that the City was assessing B&O taxes on FEHBF payments, in violation of federal law.

¶7 In response to Group Health's refund claim, the City conducted an audit of Group Health for the period at issue. The City then issued an audit determination that partly granted and partly denied Group Health's requested refund for 2000 through 2003, while asserting that Group Health owed additional B&O taxes for 2004. According to the City, the B&O tax that it imposed on Group Health during the audit period was justified because "it is necessary in the audit to split the [Group Health] premium revenue between taxable and nontaxable amounts," and that a tax on the "taxable premium amount" was not, in fact, a tax on premiums. The City asserted that it was entitled to impose a B&O tax to be paid out of premium revenue because a portion of that premium revenue was later dedicated to paying for medical services provided by Group Health's employees. To arrive at the portion of Group Health's premium revenue that the City considered to be taxable, the City calculated the portion of Group Health's total expenses dedicated to providing medical services through its own employees, and then applied that percentage directly to Group Health's gross premium revenue:

A percentage of medical services provided directly by [Group Health] employees was arrived at by [taking] the total [Group Health] medical service expenses and dividing by the total [Group Health] expenses. This percentage was then applied to the dues revenue to establish the taxable portion of dues revenue under [Seattle Municipal Code (SMC)] 5.45.090(Y).[1]

---

[1] SMC 5.45.090(Y) mirrors RCW 48.14.0201 by exempting HMOs from B&O tax assessments on premiums, but not on the provision of medical services:

Beginning on January 1, 2000, this chapter does not apply to any health maintenance organization, health care service contractor, or certified health plan in respect to premiums or prepayments that are taxable under RCW 48.14.0201. This exemption is limited to premiums and payments for health benefit plans offered by health care service contractors under RCW Chapter 48.44 and health maintenance organizations under RCW chapter 48.46 and

Of this overall "taxable portion" of the premium payments made to Group Health by its benefit plan enrollees, the City then determined the amount of medical service expenditures provided in Seattle (as opposed to other Washington localities) to arrive at the final portion of Group Health's premium revenue, upon which it imposed its B&O tax.

¶8 The City then calculated interest on both the partial B&O tax refunds and the asserted 2004 B&O tax deficiency according to the formula that it had used prior to its enactment of the "model ordinance" governing municipal B&O taxes mandated by the passage of Laws of 2003, chapter 79 (codified at chapter 35.102 RCW). It used these rates because it was directed to do so by the model ordinance, which provided, at the time that the City was required to enact it, that (as to underpayment and overpayment, respectively):

> CITIES WILL INSERT LANGUAGE IN THIS SUBSECTION FOR INTEREST DUE FOR PERIODS PRIOR TO EFFECTIVE DATE OF THE ORDINANCE.
>
> . . . .
>
> CITY WILL INSERT REFUND INTEREST LANGUAGE COVERING PERIODS PRIOR TO THE ORDINANCE EFFECTIVE DATE HERE.

¶9 RCW 35.102.140 provides that Washington "[c]ities imposing business and occupation taxes" were required to enact the model B&O tax ordinance, the mandatory provisions and other requirements of which are established by chapter 35.102 RCW, "by December 31, 2004."[2] Cities that refused to enact the model ordinance and its requirements would be barred from "impos[ing] a tax that is imposed by a city on the privilege of engaging in business activities"; likewise, cities electing to impose B&O taxes "after December 31, 2004, must comply with" the requirements of

---

does not apply to health care services directly delivered by the employees of a health maintenance organization under RCW Chapter 48.46.

SMC 5.45.090(Y).

[2] The model ordinance itself was created by a "representative sampling of cities" that impose B&O taxes, "working though the association of Washington cities." RCW 35.102.040(1)(a).

chapter 35.102 RCW. RCW 35.102.140. Among these requirements is that interest on municipal B&O tax under- and overpayments be computed in accordance with RCW 82.32.050 and .060, respectively. RCW 35.102.080. RCW 82.32.050 and .060, in turn, set the under- and overpayment interest rates for the State's separate B&O tax. One of these rates, the overpayment interest rate, is different from the rate that the model ordinance expressly directed the City to enact.

¶10 Group Health sued the City in King County Superior Court, challenging both the City's B&O tax audit determination and the amount of interest the City computed on its B&O tax assessment against Group Health during the audit period. Group Health also contended that, based on the City's incorrect calculation of interest on B&O tax assessments made during the audit period, the City was barred by RCW 35.102.140 from assessing *any* B&O tax against Group Health during 2005. On cross-motions for summary judgment, the trial court ruled against Group Health with respect to its claim that the City was barred from assessing any 2005 B&O taxes, but agreed with Group Health that RCW 48.14.0201(7) barred the City from taxing Group Health's premium revenue and that 5 U.S.C. § 8909(f) barred the City from taxing FEHBF payments.

¶11 Both parties appeal.

## II

¶12 This case "was resolved below on cross-motions for summary judgment, and thus our review is de novo." *Cmty. Telecable of Seattle, Inc. v. City of Seattle, Dep't of Executive Admin.*, 164 Wn.2d 35, 41, 186 P.3d 1032 (2008) (citing *Qwest Corp. v. City of Bellevue*, 161 Wn.2d 353, 358, 166 P.3d 667 (2007)). "[T]he burden is on the taxpayer to prove that a tax paid by him or her is incorrect." *Ford Motor Co. v. City of Seattle*, 160 Wn.2d 32, 41, 156 P.3d 185 (2007).

## III

¶13 In its appeal, the City first contends that the trial court erred by ruling that the City's audit determination assessing B&O taxes against Group Health imposed a tax on health care premiums in violation of RCW 48.14-.0201(7). The City contends that its method of calculating the "taxable portion" of Group Health's premium revenue was not, in fact, a tax on health care premiums because some portion of Group Health's premium revenue is necessarily spent on the direct provision of health care services by Group Health employees. Thus, according to the City, because nothing bars it from assessing B&O taxes against the provision of medical services, it may tax that portion of Group Health's premium revenue that Group Health spends to provide such services. Group Health responds that the State has taxed Group Health's premium revenue as premiums under the state premiums tax, and has itself limited state B&O tax assessments exclusively to Group Health's service revenue. Group Health contends that, given this, and given RCW 48.14.0201(7)'s express prohibition on municipal taxation of health care premiums, the City does not reobtain the authority to impose B&O taxes on HMO premiums simply by claiming that a portion of that revenue is spent upon health care services. Group Health is correct.

¶14 RCW 48.14.0201 imposes a two percent tax on the "the total amount of all premiums and prepayments for health care services received" by HMOs each year. RCW 48.14.0201(1), (2). The statute then expressly preempts municipalities from imposing additional taxes on HMO premiums and prepayments, while reserving to those municipalities the ability to tax health care services directly delivered by an HMO's employees:

Beginning January 1, 2000, the state does hereby preempt the field of imposing excise or privilege taxes upon taxpayers and no county, city, town, or other municipal subdivision shall have

the right to impose any such taxes upon such taxpayers. This subsection shall be limited to premiums and payments for health benefit plans offered by health care service contractors under chapter 48.44 RCW, health maintenance organizations under chapter 48.46 RCW, and self-funded multiple employer welfare arrangements as defined in RCW 48.125.010. The preemption authorized by this subsection shall not impair the ability of a county, city, town, or other municipal subdivision to impose excise or privilege taxes upon the health care services directly delivered by the employees of a health maintenance organization under chapter 48.46 RCW.

RCW 48.14.0201(7).

¶15 The dispute herein concerns whether this provision broadly preempts the ability of municipalities to impose B&O taxes on all premium revenue received by HMOs or whether, instead, municipalities may assess B&O taxes against the premium revenue that HMOs spend to provide health care services to their customers through their own employees.[3] Put another way, the question presented is whether the amount of taxable "health care services directly delivered" by Group Health's employees must be measured by Group Health's actual service revenue (i.e., the revenue that Group Health receives for health care services that are not covered by premium payments) or whether the City may create an entirely different measure (that includes premium revenue) of that which constitutes "health care services directly delivered" by Group Health's employees.

¶16 "A municipal corporation's authority to tax must be delegated by the state legislature." *Cmty. Telecable*, 164 Wn.2d at 41 (citing *Arborwood Idaho, LLC v. City of Kennewick*, 151 Wn.2d 359, 374, 89 P.3d 217 (2004)).

---

[3] Not all (or even most) of the premium revenue that Group Health spends on medical services is spent on "health care services directly delivered by" its employees, RCW 48.14.0201(7), because Group Health does not employ the doctors that work in its facilities. Rather, those doctors are employed by a separate corporation, Group Health Permanente, which then contracts with Group Health. The portion of Group Health's premium revenue that the City is seeking to tax, then, is that portion that is spent on the nurses, orderlies, etc., actually employed by Group Health.

"Accordingly, we engage in an analysis of the applicable state statutes to determine whether the City's tax during the audit period was permissible." *Cmty. Telecable*, 164 Wn.2d at 41.

¶17 No court has examined the scope of preemption under RCW 48.14.0201(7). Nor did the legislature make any findings or otherwise state its intent beyond the statute's plain text.[4] In the absence of such decisive authority, the City argues that the statute must be construed in favor of its position because courts must give " 'considerable deference to the construction of' an ordinance 'by those officials charged with its enforcement.' " *Ford*, 160 Wn.2d at 42 (quoting *Gen. Motors Corp. v. City of Seattle*, 107 Wn. App. 42, 57, 25 P.3d 1022 (2001)). The City's citation to *Ford* is curious, however, because it is not the City's interpretation of its own B&O tax ordinance that is here at issue. Rather, the statute to be interpreted is RCW 48.14.0201(7), which was amended by the state legislature expressly to limit the authority of cities to tax HMOs. Thus, while the City is correct that it is Group Health's burden to demonstrate that the City's assessment was improper, the City's reading of RCW 48.14.0201(7) is not entitled to judicial deference.

¶18 A more compelling interpretation of the statute under the principles articulated in *Ford* is the one given by the state Department of Revenue, which *is* charged with determining those portions of HMO revenue subject to the premium tax and those subject to the State's own B&O tax. The dividing line drawn by the department is the one between Group Health's premium and service revenue streams: during the audit period at issue in this case, Group Health was required to pay to the department the two percent premium tax on of all its premium revenue, but was required to report and pay state B&O taxes *only* on its service revenue. Thus, the State, which assesses both premium and B&O taxes, treats B&O taxes as measurable

---

[4] Laws of 1998, ch. 323.

only against revenue streams that are *not* subject to the premium tax.

¶19 This interpretation of the statute is logical, and we adopt it. Contrary to the City's contention, reading RCW 48.14.0201(7) to bar it from assessing its B&O tax against premium revenue does not make the last sentence of the section surplusage. Rather, that sentence does what it appears to do—it makes clear that the legislature did not intend to preempt the ability of municipalities to impose excise or privilege taxes on "health care services directly delivered" by HMOs that are not covered by the prepaid benefit plans purchased by HMO customers. That is, the sentence clarifies that the preemption imposed by RCW 48.14.0201(7) may not be used by HMOs to avoid municipal taxation of revenue other than premium revenue. It is far less plausible that the sentence was included by the legislature in order to allow municipalities to assess taxes against premium revenue, notwithstanding that the State has expressly "preempt[ed] the field of imposing excise or privilege taxes upon" HMO premiums. RCW 48.14.0201(7).

¶20 The City is correct that RCW 48.14.0201(7) does create inherent tax advantages for HMOs as opposed to independent health care insurers and providers. This is so because when health care insurance businesses are wholly separate from health care providers, customer payments toward premiums are in effect taxed twice—once through the premium tax imposed on insurance carriers, and again, as state and municipal B&O taxes, when those same funds are collected by health care providers as gross revenue in exchange for the provision of services. HMOs, in contrast, provide some health care services in direct exchange for premium payments and, thus, do not have gross revenue separate from those premium payments (other than service revenue) against which municipal B&O taxes may be measured.

¶21 But the fact that RCW 48.14.0201(7) creates tax advantages for one type of health care provider over another does not mean (as the City in effect contends) that the

legislature did not intend to preempt local taxation of all premium payments. Countless tax laws have different effects on different taxpayers. Here, the language of the statute is clear—the State has "preempt[ed] the field of imposing excise or privilege taxes" on "premiums and payments for health benefit plans." RCW 48.14.0201(7). Contrary to the City's protestations, *measuring* its B&O tax assessment against Group Health's premium revenue is functionally indistinguishable from treating the collection of that revenue as the *incident* of the tax—which the legislature has expressly forbidden and which the Department of Revenue itself forbears to do.

¶22 By allowing that RCW 48.14.0201(7) "shall not impair the ability of a county, city, town, or other municipal subdivision to impose excise or privilege taxes upon the health care services directly delivered" by HMOs, the legislature did not intend to allow municipalities to impose B&O taxes on HMO premium revenue. Rather, it intended to make clear that HMOs could not avoid municipal taxation of revenue received as direct payment for services. In its audit determination of Group Health's B&O tax liability from 2000 to 2004, the City attempted to recast a portion of the premium payments made to Group Health as payments made for direct provision of medical services in order to assess B&O taxes against those payments. By its own admission, the City is taxing premium revenue. There is no basis in the text of RCW 48.14.0201(7) for accepting the distinction between health care "premiums" and "premium revenue" that the City attempts to make. Because RCW 48.14.0201(7) prohibits municipal taxation of health care premiums, we reject the City's contention to the contrary and affirm the ruling of the trial court.

## IV

¶23 The City next contends that the trial court erred by ruling that federal law barred it from assessing B&O taxes against revenue that Group Health received as pay-

ments from the FEHBF. According to the City, because Group Health provides medical services as well as acting as an insurer, the City was not taxing Group Health in its role as a "carrier" and, thus, the federal preemption of state and municipal taxation of FEHBF payments does not apply. This is, however, an incorrect reading of the federal statute that preempts municipal taxation of FEHBF payments.

¶24 The FEHBA provides that neither states nor municipalities may impose any tax on FEHBF payments, but that this preemption does not affect broadly applicable taxes on income or profits:

(1) No tax, fee, or other monetary payment may be imposed, directly or indirectly, on a carrier or an underwriting or plan administration subcontractor of an approved health benefits plan by any State, the District of Columbia, or the Commonwealth of Puerto Rico, or by any political subdivision or other governmental authority thereof, with respect to any payment made from the Fund.

(2) Paragraph (1) shall not be construed to exempt any carrier or underwriting or plan administration subcontractor of an approved health benefits plan from the imposition, payment, or collection of a tax, fee, or other monetary payment on the net income or profit accruing to or realized by such carrier or underwriting or plan administration subcontractor from business conducted under this chapter, if that tax, fee, or payment is applicable to a broad range of business activity.

5 U.S.C. § 8909(f). Thus, "[u]nder section 8909(f)(1), state regulation is preempted if it is (1) a state or local tax, fee, or other monetary payment; (2) imposed directly or indirectly on a carrier; and (3) with respect to payments made from the [FEHBF]." *Health Maint. Org. of N.J., Inc. v. Whitman*, 72 F.3d 1123, 1128 (3d Cir. 1995). The only instance in which such taxes are not barred is when they both are on the "net income or profit" of the carrier and are "applicable to a broad range of business activity." 5 U.S.C. § 8909(f)(2); *Whitman*, 72 F.3d at 1131-32.

¶25 The City does not dispute that its B&O tax is a local tax, or that the tax is being assessed against revenue that

includes, in part, payments from the FEHBF. Rather, the City contends that its B&O tax assessments against Group Health cannot be preempted by 5 U.S.C. § 8909(f) because the City is taxing Group Health in its role as a health care *provider*, thus negating the statute's requirement that the tax be "imposed, directly or indirectly, on a carrier." 5 U.S.C. § 8909(f)(1). This argument does not withstand scrutiny. It is undisputed that Group Health is a "carrier" that contracts with the federal government to provide health care coverage in exchange for FEHBF payments. It is also undisputed that the City's B&O audit determination seeks to impose B&O taxes on revenue obtained by Group Health in the form of payments from the FEHBF. No statute, regulation, federal agency interpretive statement, court case, or any other legal authority supports the contention that, by unilaterally recharacterizing an HMO as a health care "provider" rather than a carrier (which is how the federal government characterizes Group Health), the City may avoid the prohibition imposed by 5 U.S.C. § 8909(f) and thus tax FEHBF revenue.[5]

¶26 In contrast, guidelines issued by the federal Office of Personnel Management, which manages the FEHBF, confirm that measuring taxes against FEHBF payments is prohibited, however it is characterized. *See* 48 C.F.R. § 1631.205-41 (preemption "applies to all payments directed by States or municipalities, regardless of how they may be titled, to whom they must be paid, or the purpose for which they are collected, and it applies to *all forms of direct and indirect measurements* on [Federal Employee Health Benefit Program] premiums, however modified" (emphasis added)).

---

[5] The City contends that the Fourth Circuit's decision in *United States v. West Virginia*, 339 F.3d 212 (4th Cir. 2003), supports its position that it may impose taxes on FEHBF payments, provided that it labels their recipients as "providers" rather than "carriers." But *West Virginia* is not on point; there is no question that the state tax at issue in that case was "imposed on the gross receipts of providers, and [was] in no way aimed at carriers." *West Virginia*, 339 F.3d at 219 (Traxler, J., concurring).

¶27 Similarly, the FEHBA's savings clause does not support the City's position. Group Health does not dispute that the City's B&O tax is "applicable to a broad range of business activity." But as Group Health points out—and the City itself observes in its briefing—the City's B&O tax is not a tax on "net income or profit." 5 U.S.C. § 8909(f)(2). Nor is it even *measured* by net income or profit. Rather, it is expressly a tax on the "privilege of *engaging in business* activities within the City" and is "determined by application of rates against *gross proceeds* of sale, *gross income* of business, or value of products." SMC 5.45.050 (emphasis added). The FEHBF revenue taxed in the City's audit determination falls squarely within the category of taxes expressly preempted by FEHBA and, as such, was assessed in violation of federal law. The trial court correctly so ruled.

V

¶28 In its cross-appeal, Group Health contends that the City was barred from assessing any B&O tax at all against Group Health during 2005, and that the trial court's ruling to the contrary must be reversed. The basis for this contention is Group Health's assertion that a state statute directing cities to enact a model ordinance governing B&O taxes, chapter 35.102 RCW, completely barred the City from imposing B&O taxes during 2005. In making this argument, Group Health does not contend that the City was deprived of its authority to impose any B&O tax because it failed to enact the model ordinance, as it was directed to do by the legislature. In fact, the City did enact the model ordinance. Rather, Group Health contends that because the model ordinance *itself* incorrectly directed the City to utilize its pre-2005 interest rates on tax deficiencies and overpayments, chapter 35.102 RCW repealed the City's authority to impose any B&O tax at all. In other words, Group Health's position (although Group Health does not say so outright) is that chapter 35.102 RCW stripped the City of its ability to impose B&O taxes both if the City *did*

enact the model ordinance and if the City *did not* enact the model ordinance. We disagree.

¶29 The legislature did not intend chapter 35.102 RCW to serve as an implied repeal of the City's B&O taxing authority in the event that the committee that drafted the model ordinance failed to incorporate the legislature's directives with respect to the computation of interest. Instead, the legislature intended that deficiencies in the model ordinance be remedied by cities *complying* with statutory requirements—*not* by having their power to impose B&O taxes stripped from them. Here, the City amended its enacted version of the model ordinance to comply with chapter 35.102 RCW's statutory interest requirements as soon as it became clear that the model ordinance had been incorrectly drafted. It also promptly refunded to Group Health the deficiency in Group Health's B&O tax refund that resulted from the incorrect computation of interest on taxes assessed during the audit period. The trial court correctly ruled that Group Health was entitled to no more.

¶30 In 2003, the legislature enacted Laws of 2003, chapter 79 in response to concerns that the patchwork of municipal B&O tax ordinances across the state was subjecting businesses to multiple and conflicting B&O taxes. The law sought to promote uniformity among municipal B&O tax laws, and so to better serve the needs of taxpayers, while ensuring that cities would continue to receive the B&O tax revenue necessary to provide essential services:

> The legislature finds that businesses in Washington are concerned about the potential for multiple taxation that arises due to the various city business and occupation taxes and are concerned about the lack of uniformity among city jurisdictions. The current system has a negative impact on Washington's business climate. The legislature further finds that local business and occupation tax revenue provides a sizable portion of city revenue that is used for essential services. The legislature recognizes that local government services contribute to a healthy business climate.

The legislature intends to provide for a more uniform system of city business and occupation taxes that eliminates multiple taxation, while allowing for some continued local control and flexibility to cities.

LAWS OF 2003, ch. 79, § 1 (codified at RCW 35.102.010). Upon its enactment, chapter 35.102 RCW required cities imposing B&O taxes to form a "model ordinance development committee" of city officials "work[ing] through the association of Washington cities," to draft a model B&O tax ordinance, and to adopt the mandatory provisions of that ordinance by December 31, 2004. RCW 35.102.040(1)(a), .140.

¶31 In order to ensure that cities complied with this directive, the legislature prohibited those cities that failed to timely meet chapter 35.102 RCW's requirements from imposing B&O taxes until such time as they were in compliance:

> Cities imposing business and occupation taxes must comply with all requirements of RCW 35.102.020 through 35.102.130 by December 31, 2004. A city that has not complied with the requirements of RCW 35.102.020 through 35.102.130 by December 31, 2004, may not impose a tax that is imposed by a city on the privilege of engaging in business activities. Cities imposing business and occupation taxes after December 31, 2004, must comply with RCW 35.102.020 through 35.102.130.

RCW 35.102.140.

¶32 Among the requirements of chapter 35.102 RCW are that cities compute deficient or excess B&O tax payment interest according to the formulas set forth in RCW 82.32.050 and .060, respectively—the interest rates set forth by the State for use by the Department of Revenue when it computes refund or penalty interest on its own B&O tax assessments. Enacted to make interest calculations by municipalities consistent with the calculations used by the State, RCW 35.102.080 requires that cities imposing B&O taxes "shall compute interest charged a taxpayer on an underpaid tax or penalty in accordance with

RCW 82.32.050" and "shall compute interest paid on re-
funds or credits of amounts paid or other recovery allowed
a taxpayer in accordance with RCW 82.32.060."

¶33 The dispute herein centers on whether RCW 35.102-
.140 means that, as Group Health contends, a flaw in the
model ordinance that the City was required to enact—here,
the failure to ensure that interest on tax assessments made
before January 1, 2005, be computed "in accordance with"
RCW 82.32.050 and .060—also means that the City could
"not impose" any B&O tax during the time its code included
provisions inconsistent with the requirements of RCW
35.102.080. The other possible interpretation of RCW
35.102.140 is that, rather than retroactively repealing the
City's B&O taxing power in the event imperfections are
discovered in the City's enacted version of the model
ordinance, RCW 35.102.140 instead simply requires that
the City now "comply with" RCW 35.102.080.

¶34 How this question became the subject of the current
litigation requires additional discussion. It is undisputed
that the City timely enacted the model ordinance as writ-
ten. The provisions of the model ordinance governing com-
putation of interest on B&O tax under- and overpayments
did not, however, simply reference RCW 82.32.050 and .060,
or otherwise require application of the interest rates set
forth in those statutory provisions. Rather, the model ordi-
nance directed the City to enact code provisions govern-
ing interest computation on periods prior to the effective
date of the ordinance that mirrored the City's *prior* under-
and overpayment interest rate ordinance provisions. With
respect to underpayment interest, the model ordinance
provided:

> CITIES WILL INSERT LANGUAGE IN THIS SUBSECTION
> FOR INTEREST DUE FOR PERIODS PRIOR TO EFFEC-
> TIVE DATE OF THE ORDINANCE.

With respect to overpayment interest, the model ordinance
provided:

CITY WILL INSERT REFUND INTEREST LANGUAGE COV-ERING PERIODS PRIOR TO THE ORDINANCE EFFEC-TIVE DATE HERE.

¶35 Following this directive, the City reenacted the same interest rates for under- and overpaid B&O taxes assessed during periods prior to 2005 that it had previously used:

> Interest on underpayments of taxes . . . shall be an average of the federal short-term rate as defined in 26 U.S.C. Sec. 1274(d) plus two (2) percentage points.
>
> . . . .
>
> Interest on overpayments of taxes for periods beginning on or after January 1, 2002, shall be the average federal short term interest rate, as defined under SMC 5.55.090 B(2), less two (2) percentage points.

Former SMC 5.55.090(B)(2) (2004); former SMC 5.55-.100(E)(2) (2004); *see also* City of Seattle Ordinance 121266 §§ 19, 21 (2003). The interest rate assessed against under-paid taxes is the same as that set forth in RCW 82.32.050(2) ("For the purposes of this section, the rate of interest to be charged to the taxpayer shall be an average of the federal short-term rate as defined in 26 U.S.C. Sec. 1274(d) plus two percentage points."). The rate of overpayment interest, however, is *not* the same as the one set forth in RCW 82.32.060. That section requires that overpayment interest be calculated at the same rate as underpayment interest. *See* RCW 82.32.060(4)(a) ("Interest allowed after December 31, 1998, shall be computed at the rate as computed under RCW 82.32.050(2)."). Thus, by following the directives of the model ordinance, the City enacted an underpayment interest provision that was consistent with the require-ments of RCW 35.102.080, but an overpayment interest provision that was less favorable to taxpayers. As Group Health correctly points out, this resulted in a calculation of the net interest due to it during the audit period different from (and less than) the interest that it would have received had the City utilized the interest formulas set forth in both RCW 82.32.050 and .060.

¶36 The City contends that the ordinance drafting committee's rationale for requiring application of premodel ordinance interest rates to overpayments of B&O taxes assessed before 2005, rather than the rate set forth in RCW 82.32.060, was its collective belief that the relevant dates for purposes of the interest rate were the years of business operation upon which the *B&O tax was assessed*, rather than the date upon which *interest was computed* for B&O tax overpayments. The City and Group Health differ, however, as to whether this belief was correct. The City and those amici favoring the City's position[6] contend that requiring the City to compute overpayment interest on taxes assessed before 2005 in accordance with RCW 82.32.060 is an unlawful, retroactive application of RCW 35.102.080. According to the City, because the legislature did not indicate that it intended RCW 35.102.080 to be applied retroactively, the interpretation sought by Group Health— that the date interest is actually computed is the critical date with respect to whether the requirements of RCW 35.102.080 apply—is flawed.

¶37 Group Health responds that this is a mischaracterization of its position, and that it has never contended that RCW 35.102.080 must be applied retroactively. Group Health contends that, rather, it is the date upon which interest for B&O tax overpayment is *computed* that determines whether the statute is being applied retroactively and, accordingly, which interest rate should apply. Thus, a threshold issue as to whether Group Health is entitled to relief is whether the City is correct that a requirement that overpayment interest on taxes assessed before 2005 be computed in accordance with RCW 82.32.060 is an illegitimate, retroactive application of RCW 35.102.080.

¶38 On this question, Group Health is correct. In drafting the model ordinance, the model ordinance committee

---

[6] The Washington State Association of Municipal Attorneys and the Association of Washington Cities have filed an amici brief in support of the City on this issue. The Association of Washington Business has filed an amicus brief in support of Group Health's position.

should have required that the rates set forth in RCW 82.32.050 and .060 be used to compute interest on underpayments and overpayments of taxes assessed before December 31, 2004, if the interest is computed after December 31, 2004. We so conclude for several reasons: (1) this interpretation is consistent with the plain text of RCW 35.102.080; (2) this interpretation is consistent with longstanding Washington case law; and (3) the contrary interpretation, which the City favors, is directly contradictory to the interpretation given the statute in question by the Department of Revenue. As previously discussed, because the Department of Revenue is the agency charged with administering RCW 82.32.060, its interpretation of that statute, while not controlling, is persuasive.

¶39 First, the plain text of RCW 35.102.080 supports the conclusion that it requires overpayment interest to be computed according to the formulas set forth in RCW 82.32.060 if the interest computation is done after December 31, 2004. RCW 35.102.080(2) states that "[a] city that imposes a business and occupation tax *shall compute interest paid* on refunds or credits . . . in accordance with RCW 82.32.060." (Emphasis added.) Cities imposing B&O taxes were required to comply with this provision by the first day of 2005. RCW 35.102.140. There is no indication in the text of RCW 35.102.080(2), or anywhere else in chapter 35.102 RCW, that the legislature intended to exempt interest on taxes assessed prior to the City's enactment of the model ordinance from the requirements of RCW 82.32.060.

¶40 Moreover, long-standing case law supports the conclusion that the legislature intended to require that cities apply the interest rate set forth in RCW 82.32.060 to all overpayment interest computed after 2004. More than seven decades ago, our Supreme Court held that a newly enacted statutory interest rate applied to tax assessments made in years before the interest rate was changed. *Henry v. McKay*, 164 Wash. 526, 534, 3 P.2d 145 (1931) ("The treasurer should look, not to the old act, but to the statute in force at the time of the tender, for computing the interest

chargeable on the delinquent tax."). *Henry* still states the general orientation of the law in Washington, and "the legislature is presumed to know the existing state of the case law in those areas in which it is legislating." *Woodson v. State*, 95 Wn.2d 257, 262, 623 P.2d 683 (1980).

¶41 Finally, the Department of Revenue has long concluded that the relevant date for determining the interest rate applied is the date upon which interest is computed, *not* the tax period giving rise to the overpayments or deficiencies upon which the interest is assessed. *See* Wash. Dep't of Revenue Determination No. 90-372, 10 Wash. Tax Dec. 159, 169 (1990) (imposition of real estate excise tax penalty imposed on transactions that occurred before effective date of penalty statute ruled not a retroactive application of the penalty (quoting *State v. Scheffel*, 82 Wn.2d 872, 879, 514 P.2d 1052 (1973) (" 'A statute is not retroactive merely because it relates to prior facts or transactions where it does not change their legal effect. It is not retroactive because some of the requisites for its actions are drawn from a time antecedent to its passage or because it fixes the status of a person for the purposes of its operation.' " (emphasis omitted)))); *see also* Wash. Dep't of Revenue Determination No. 05-0061, 24 Wash. Tax Dec. 440, 444 (2005) ("All changes to the penalty rates were effective on July 1, 2003 and attached to penalties applied on and after that date, including penalties applied to taxes due on activities that occurred prior to that date.").

¶42 For these reasons, we agree with Group Health that the model ordinance incorrectly directed the City to apply its previously existing overpayment interest rate to Group Health's B&O tax assessment for the pre-2005 audit period.

¶43 Contrary to Group Health's contention, however, this conclusion does not end our inquiry. Having determined that Group Health correctly asserts that the model ordinance directed the City to incorrectly assess interest against its B&O tax overpayments during the audit period, we must next determine the legislature's intent with regard to the appropriate remedy in instances of noncompliance.

Based on the text and purpose of RCW 35.102.140, we conclude that the remedy to which Group Health is entitled is that which it has already received.

¶44 Our goal in construing chapter 35.102 RCW is to give effect to the legislature's intent. *Christensen v. Ellsworth*, 162 Wn.2d 365, 372, 173 P.3d 228 (2007). " '[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent.' " *Christensen*, 162 Wn.2d at 372-73 (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002)). Plain meaning is discerned from the ordinary meaning of the provision at issue, the context of the statute in which that provision is found, any related provisions, and the statutory scheme as a whole. *Christensen*, 162 Wn.2d at 373. If the statutory language is susceptible to more than one reasonable interpretation, however, we may then resort to statutory construction, legislative history, and relevant case law for assistance in discerning legislative intent. *Christensen*, 162 Wn.2d at 373 (citing *Cockle v. Dep't of Labor & Indus.*, 142 Wn.2d 801, 808, 16 P.3d 583 (2001)).

¶45 Here, pointing to the plain text of RCW 35.102.140, Group Health asserts that because the City followed the flawed directives of the model ordinance by enacting and applying the overpayment interest provision that it utilized prior to December 31, 2004, and because that interest rate differed from the rate set forth in RCW 82.32.060, the City now "may not impose a tax that is imposed by a city on the privilege of engaging in business activities." In other words, Group Health argues that RCW 35.102.140 plainly means that the legislature intended to strip the City of its power to impose any B&O tax as a penalty for doing that which it was required to do: enacting the completed (albeit flawed) model ordinance created by the legislatively-mandated model ordinance drafting committee.

¶46 The problem with Group Health's contention—that the legislature intended to wholly repeal the authority of cities to impose B&O taxes if there existed a defect in one of

the model ordinance's provisions—is that it is based on the steadfast refusal both to read RCW 35.102.140 in a manner consistent with the express purposes of chapter 35.102 RCW and to give effect to the entirety of the statutory section. In addition to providing that cities that fail to meet the requirements of the chapter may not impose B&O taxes, RCW 35.102.140 also provides that "[c]ities imposing business and occupation taxes after December 31, 2004, must comply with RCW 35.102.020 through 35.102.130." We conclude that one purpose of this text is to make clear that, rather than having to disgorge all collected B&O tax revenue in the event that the model ordinance contained drafting errors, cities may amend flawed code sections to comply with state law and then provide aggrieved taxpayers with recompense for any improperly calculated tax or interest thereon.

¶47 "A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent." 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 46:05, at 154 (6th ed. 2000). "[T]he statute must be read as a whole; intent is not to be determined by a single sentence." *Human Rights Comm'n v. Cheney School Dist. No. 30*, 97 Wn.2d 118, 121, 641 P.2d 163 (1982). "[T]he spirit or the purpose of legislation should prevail over . . . express but inept language." *Alderwood Water Dist. v. Pope & Talbot, Inc.*, 62 Wn.2d 319, 321, 382 P.2d 639 (1963).

¶48 Here, the legislature expressly set forth its intent with respect to chapter 35.102 RCW in the first section of that statute. While the legislature intended, by providing for the creation of a model ordinance governing municipal B&O taxes, to create a uniform system of taxation and thus eliminate inefficiencies and the possibility of multiple taxation, it also recognized the importance of continued B&O tax assessments, specifically noting that "local business and occupation tax revenue provides a sizable portion of city revenue that is used for essential services," and that "local government services contribute to a healthy business climate." RCW 35.102.010.

¶49 Given this affirmation of the continued legitimacy of municipal B&O taxation, it is unsurprising that RCW 35.102.140 can be read to provide a remedy to Group Health short of the wholesale repeal of the City's authority to impose B&O taxes. It can, as the City contends, also be read simply to require that cities whose B&O tax ordinances are not in conformance with the requirements of chapter 35.102 RCW after 2004 take action to "comply" with those requirements. These two different interpretations being possible, it is clear that Group Health is incorrect in asserting that RCW 35.102.140 unambiguously supports its position. Where more than one construction is possible, a statute is ambiguous. *Campbell & Gwinn*, 146 Wn.2d at 12.

¶50 Accordingly, it is appropriate for us to look to the legislative history for guidance. *Campbell & Gwinn*, 146 Wn.2d at 12. The legislative history supports the City's contention that RCW 35.102.140 was not intended to repeal the authority of municipalities to impose B&O taxes in the event of an error in the model ordinance. The house bill report demonstrates that compliance with the provisions of the statute was the goal of the legislature, rather than repeal of municipal B&O taxing power: "After December 30, 2004, a city that *fails to comply* with the non-apportionment provisions of the bill may not impose a B&O tax." H.B. REP. on Engrossed H.B. 2030, at 7, 58th Leg., Reg. Sess. (Wash. 2003) (emphasis added). The senate bill report contains even more moderate language, stating simply that "[c]ities imposing B&O taxes must comply by December 31, 2004." S.B. REP. on Engrossed H.B. 2030, at 2, 58th Leg., Reg. Sess. (Wash. 2003). The final bill report likewise supports the conclusion that the legislature's objective was ensuring compliance with the requirements of the statute, rather than repeal of municipal taxing authority: "After December 30, 2004, a city *that fails to comply* with the non-apportionment provisions of the bill may not impose a B&O tax." FINAL B. REP. on Engrossed H.B. 2030, at 5, 58th Leg., Reg. Sess. (Wash. 2003) (emphasis added).

¶51 While it is true that the legislative history supports the conclusion that the legislature intended the require-

ments of Laws of 2003, chapter 79 to be mandatory for cities imposing B&O taxes, there is nothing whatsoever in the legislative history suggesting that the legislature's objective was to impose a retroactive B&O tax revenue "death penalty" on municipalities found to have unwittingly enacted provisions of the model ordinance that were drafted in such a manner so as to be inconsistent with the statute.

¶52 It is inconsistent with both the purpose and history of chapter 35.102 RCW to construe RCW 35.102.140 as mandating a wholesale repeal of the City's authority to impose any B&O tax due to a single error in the City's enacted version of the legislatively-mandated model ordinance. A more plausible construction of the statute gives effect to the last sentence of RCW 35.102.140: that a city computing B&O tax interest that is inadvertently not in compliance with the requirements of RCW 35.102.080 "must comply with" that section by revision of its municipal code and payment of recompense to taxpayers harmed by the misapplication of the legislature's directives.

¶53 That is precisely what happened here. There is no dispute but that, upon becoming aware of the discrepancies between the City's and the State's rates of overpayment interest payable to Group Health for B&O tax assessments during the audit period, the City (1) promptly refunded to Group Health the full amount of the deficient interest and (2) amended SMC 5.55.090 and .100 so that they both require that the City "compute interest in accordance with RCW 82.32.050 [and .060] as [they] now exist[ ] or as [they] may be amended." SMC 5.55.090(B), .100(E).

¶54 Accordingly, although we agree with Group Health that the former overpayment interest provision of the SMC, enacted consistent with the requirements of the model ordinance, failed to meet the requirements of RCW 35-.102.080, we conclude that the proper remedy for this deficiency was the amendment of the offending provision and the refund to Group Health of the improperly withheld interest. This is the remedy that Group Health has already received. Thus, Group Health is not entitled to a complete

refund of its 2005 B&O tax payment to the City, and the trial court correctly so ruled.

¶55 Affirmed.

AGID and LEACH, JJ., concur.