# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| GREEN COLLAR CLUB, RAINIER XPRESS, individually, and TRIPLE C COLLECTIVE, LLC, | No.  50437-5-II |
| Appellants, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF REVENUE, | PUBLISHED OPINION |
| Respondent. | |

JOHANSON, J. — Rainier Xpress (RX), Green Collar Club (GCC), and Triple C Collective, LLC (TCC) (collectively "Taxpayers") appeal the superior court's order denying their summary judgment motion and the order granting summary judgment to the Department of Revenue (DOR). At issue is whether the Taxpayers engaged in taxable retail sales of medical marijuana between 2011 and 2014. First, the Taxpayers argue that GCC and TCC were not engaged in "retail sales." Second, the Taxpayers argue that the transactions were exempt from sales tax under either the prescription drug or medicine of botanical origin exemptions. We hold that as a matter of law, the Taxpayers engaged in retail sales that were not tax exempt. Accordingly, we affirm.

FACTS

I. BACKGROUND: COMMUNITY GARDEN OPERATIONS

The Taxpayers are businesses involved with community gardens established under former RCW 69.51A.085 (2011). Former RCW 69.51A.085(1) provided that "[q]ualifying patients may create and participate in collective gardens for the purpose of producing, processing, transporting, and delivering cannabis for medical use subject to" enumerated conditions.[1] RX admits that it sold products containing medical marijuana to collective garden members. GCC and TCC deny involvement with such sales.

GCC's and TCC's community garden formation agreements provided that "members" of the collective garden would acquire and supply resources to produce, process, and share medical marijuana. The agreements also provided that the *members would establish* a "management entity which will direct and oversee the day to day operations of the Collective Garden for the benefit of its members." Clerk's Papers (CP) at 83, 288. A maximum of 10 members who were qualified to obtain medical marijuana under ch. 69.51A RCW could participate in a collective garden at any one time. And each garden's formation agreement provided that the garden would have 3 "permanent" members and 7 memberships reserved for nonpermanent members.

GCC and TCC submitted substantively identical declarations describing the nature of their medical marijuana business operations. The declarations assert that GCC and TCC provide

---

[1] In 2015, the legislature enacted comprehensive reform concerning the regulation of medical marijuana in Washington. LAWS OF 2015, ch. 70. This case concerns the law as it existed prior to the 2015 enactment. References to statutes in this opinion refer to the statutes as they existed prior to the 2015 enactment and, where appropriate, to current statutes that are substantively identical to the prior statutes for the purposes of this case.

"management services" to community gardens pursuant to "management agreements." CP at 77, 282. Under the management agreements, GCC and TCC staffed each garden's "meeting place" during "regular hours," controlled access to the facility so only members could obtain medical marijuana, maintained membership applications and resignations, verified and confirmed that members were authorized to obtain medical marijuana, maintained records, and produced reports of the management company's expenditures made on behalf of the garden. CP at 77, 282. The offices that GCC and TCC operated were locations where "the participating patient members access" the medical marijuana and "make the ongoing contributions necessary to keep a supply of medicine for the participating patient members." CP at 78, 283.

To obtain medical marijuana at the collective gardens' meeting places, patients authorized to obtain medical marijuana approached an attendant at a window and furnished valid documentation. GCC and TCC management company employees and garden members staffed the window. Once staff confirmed the valid documentation, the prospective member signed a membership agreement and completed a membership application. Members of the collective garden could select from various marijuana products and then make "an appropriate contribution to the garden" for the marijuana selections. CP at 80, 285.

GCC and TCC provided "menus" containing descriptions of marijuana products and associated prices for specific amounts of each product. Most people contributed money in exchange for the medical marijuana products. Other types of contributions included assisting members in making selections, contributing hardware, and providing labor at the grow site or processing facility. GCC and TCC declared gross income of tens of thousands of dollars per month for medical marijuana sales during the relevant taxing period on their excise tax returns.

After selecting their medical marijuana and making their "contribution," nonpermanent members were required to "formally resign their membership." CP at 79, 284. Any person seeking medical marijuana at the collective gardens, whether new or returning, needed to complete this process each time so that others could become nonpermanent members and obtain marijuana.

## II. PROCEDURAL FACTS

The DOR notified the Taxpayers that medical marijuana sales are subject to sales tax. The Taxpayers paid the taxes for transactions that occurred between 2011 and 2014. Then they requested refunds. The DOR denied the refund requests.

The Taxpayers then filed actions for tax refunds under RCW 82.32.180. The superior court consolidated the three refund actions. The Taxpayers and the DOR filed cross motions for summary judgment. The superior court granted summary judgment to the DOR and denied summary judgment to the Taxpayers. The Taxpayers appeal.

## ANALYSIS

### I. STATUTORY BACKGROUND

#### A. MEDICAL MARIJUANA AND COLLECTIVE GARDENS

In 1998, Washington voters approved Initiative 692 (I-692), which was later codified at ch. 69.51A RCW. LAWS OF 1999, ch. 2 (I-692, approved November 3, 1998). Under this chapter, "qualifying patients" could possess medical marijuana and have an affirmative defense against criminal offenses for marijuana production, possession, and use if they meet specific statutory conditions. Former RCW 69.51A.040 (2011); *State v. Reis*, 183 Wn.2d 197, 204-05, 351 P.3d 127 (2015). A person was a "qualifying patient" if a Washington licensed health care professional diagnosed a patient with a terminal or debilitating medical condition, advised the patient of the

4

benefits and risks of marijuana, and provided "[v]alid documentation" indicating that "in the health care professional's professional opinion, the patient may benefit from the medical use of marijuana." Former RCW 69.51A.010(4)(a)-(e), (7)(a) (2010).[2] To assert the affirmative defense, a qualifying patient who is not registered with the department of health must present the patient's "valid documentation" to any law enforcement official questioning the asserted medical use or possession of marijuana. Former RCW 69.51A.043.

Health care professionals who comply with enumerated conditions do not commit a crime under state law when they advise patients about the risks and benefits of medical use of marijuana, state that the patient may benefit from it, or provide them with valid documentation to obtain medical marijuana. Former RCW 69.51A.030 (2011).

Qualifying patients may participate in "collective gardens" to pool resources and grow medical marijuana for their own use. Former RCW 69.51A.085(1); *Cannabis Action Coal. v. City of Kent*, 183 Wn.2d 219, 221-22, 351 P.3d 151 (2015). No more than 10 qualifying patients may participate in a single collective garden at one time. Former RCW 69.51A.085(1)(a).

B. CONTROLLED SUBSTANCES

State and federal law provide comprehensive statutory schemes to control the manufacture, distribution, and use of controlled substances. Uniform Controlled Substances Act, 21 U.S.C. §§

---

[2] The legislature has amended the definition of "valid documentation" several times since 1998, and the most recent term used for this documentation is "authorization." RCW 69.51A.010(1)(a). The statutory term during the relevant time period is "valid documentation." Former RCW 69.51A.010(7). The parties use the terms "authorization" and "valid documentation" interchangeably.

801-904 (2012); ch. 69.50 RCW. Individuals who violate these laws are subject to penalties. 21 U.S.C. §§ 841-865; RCW 69.50.401-.465.

Both bodies of law place controlled substances in numerical schedules I to V. 21 U.S.C. §§ 811-812; RCW 69.50.203-.212. Substances on schedule I are illegal under all circumstances except for research, and they have no accepted medical use. 21 U.S.C. § 812(b)(1)(B)-(C), §§ 841-865 (establishing offenses and penalties); § 823(a)(1) (providing an exception for approved research); RCW 69.50.203; RCW 69.50.401-.465.

Both federal and state statutes list marijuana as a schedule I controlled substance. RCW 69.50.204(c)(22); 21 C.F.R. § 1308.11(d)(23); 21 U.S.C. § 812(c), sched. I, cl. (c)(10); *Seeley v. State*, 132 Wn.2d 776, 782-83, 940 P.2d 604 (1997). Under federal law, as a schedule I drug, marijuana cannot be lawfully prescribed. 21 U.S.C. §§ 822-23; former RCW 69.50.308 (2013); *Seeley*, 132 Wn.2d at 782-83. In Washington, controlled substances may be prescribed only under specific statutory conditions, and schedule I drugs are not prescribed under the relevant statute. *See* former RCW 69.50.308.

Medical professionals who prescribe controlled substances must be registered with the Drug Enforcement Administration, and a registration to prescribe controlled substances can be obtained only for substances on schedules II to IV. 21 C.F.R. § 1301.11; 21 C.F.R. § 1301.13. Pharmacies and pharmacists are required to distribute drugs approved by federal law for distribution by pharmacies, subject to narrow exceptions. WAC 246-869-010; WAC 246-863-095. Physicians who prescribe marijuana in violation of federal law may have their registration to prescribe controlled substances revoked. *Conant v. Walters*, 309 F.3d 629, 632 (9th Cir. 2002). But under the First Amendment of the United States Constitution, doctors may discuss the

advantages and risks of marijuana use and recommend the use of marijuana in the context of the doctor-patient relationship. *Conant*, 309 F.3d at 636-39.

## II. PRINCIPLES OF LAW

We review a summary judgment order de novo, and we perform the same inquiry as the superior court. *Sheehan v. Cent. Puget Sound Reg'l Transit Auth.*, 155 Wn.2d 790, 796-97, 123 P.3d 88 (2005). We consider all the evidence submitted to the superior court and all reasonable inferences from the evidence in the light most favorable to the nonmoving party. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). The moving party is entitled to summary judgment if it shows that pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Sheehan*, 155 Wn.2d at 797; CR 56(c).

"Taxes are presumed to be just and legal, and the burden is on the taxpayer to prove that the tax is incorrect." *AOL, LLC v. Dep't of Revenue*, 149 Wn. App. 533, 554, 205 P.3d 159 (2009) (citing *Ford Motor Co. v. City of Seattle, Exec. Servs. Dep't*, 160 Wn.2d 32, 41, 156 P.3d 185 (2007)). The taxpayer seeking a refund has the burden of proving that the DOR incorrectly assessed the tax and it is entitled to a refund. RCW 82.32.180; *Wash. Imaging Servs., LLC v. Dep't of Revenue*, 171 Wn.2d 548, 555, 252 P.3d 885 (2011).

III.  MEDICAL MARIJUANA "SALES"

The parties disagree whether GCC and TCC were engaged in "retail sales" of medical marijuana subject to retail sales tax.[3]  We hold that the superior court did not err when it found as a matter of law that GCC and TCC were engaged in "retail sales."

A.  PRINCIPLES OF LAW

Courts focus on the substance of a transaction to determine how it is classified for tax purposes, rather than relying on the characterization of transactions provided in taxpayers' contracts with third parties.  *First Am. Title Ins. Co. v. Dep't of Revenue*, 144 Wn.2d 300, 303-05, 27 P.3d 604 (2001); *Wash. Imaging Servs.*, 171 Wn.2d at 556-57.  The Taxpayers have the burden to show that they were not subject to retail sales tax and instead are entitled to a refund.  RCW 82.32.180; *AOL*, 149 Wn. App. at 554 (citing *Ford Motor Co.*, 160 Wn.2d at 41).

There is a 6.5 percent tax "on each retail sale in this state of:  (a) Tangible personal property, unless the sale is specifically excluded from the RCW 82.04.050 definition of retail sale."  RCW 82.08.020(1)(a).  A "retail sale" is "every sale of tangible personal property . . . to all persons irrespective of the nature of their business."  RCW 82.04.050(1)(a).  A "sale" includes "any transfer of the ownership of, title to, or possession of property for a valuable consideration."  Former RCW 82.04.040(1) (2004).

B.  RETAIL SALES

The Taxpayers argue that GCC and TCC were "separate entities" that merely provided services to the collective gardens and did not engage in retail sales.  Reply Br. of Appellant at 4.

---

[3] Appellants agree that RX sold products containing medical marijuana to patients and thus engaged in "sales" that are subject to sales tax unless an exemption applies.

The DOR argues that GCC's and TCC's declarations and interrogatories show that they *were* engaged in retail sales of medical marijuana. We agree with the DOR that because GCC and TCC accepted valuable consideration in exchange for medical marijuana, they engaged in retail sales as a matter of law.

To support their assertion that GCC and TCC were merely "management companies" that provided "services" to the collective gardens, the Taxpayers cite their formation agreements, management agreements, and interrogatories. Reply Br. of Appellant at 4. The Taxpayers are correct that their formation agreements provide that the collective garden members will establish a "management entity which will direct and oversee the day to day operations of the Collective Garden for the benefit of its members." CP at 83, 288. In addition, GCC's and TCC's formation and management agreements stated that they would provide "management services" to the collective gardens, and the interrogatories assert that GCC and TCC provided services and did not engage in retail sales. CP at 77, 282.

But the formation and management agreements do not define whether GCC and TCC engaged in taxable conduct; rather, we examine the *substance of their actual conduct* to determine whether they engaged in taxable retail sales. *See First Am. Title Ins. Co.*, 144 Wn.2d at 303-05; *Wash. Imaging Servs.*, 171 Wn.2d at 556-57.

The DOR points to facts in the declarations, formation agreements, management agreements, and interrogatories that support that GCC and TCC engaged in retail sales of medical marijuana. Wash. Court of Appeals oral argument, *Rainer Xpress v. Dep't of Revenue*, No. 50437-5-II (Jan. 9, 2018), at 18 min., 12 sec. through 20 min., 22 sec. (on file with court). To obtain medical marijuana at the collective gardens' meeting places, authorized patients approached an

attendant at a window, which was *staffed by "either" GCC and TCC employees or garden member volunteers*, and furnished valid documentation required to obtain medical marijuana. Once staff or volunteers verified the documentation, the prospective member signed a membership agreement and completed a membership application, selected from various medical marijuana products, and made "an appropriate contribution to the garden." CP at 80, 285. Most patients contributed money in exchange for their medical marijuana products based on "menus" containing descriptions of marijuana products and associated prices for specific amounts of each product. Upon leaving the store, the patient resigned his or her membership. These undisputed facts show that the transaction had the characteristics of commercial retail sales. GCC and TCC also declared gross income of tens of thousands of dollars per month for medical marijuana sales during the relevant taxing period on their excise tax returns.

Based on these undisputed facts, GCC and TCC managed and staffed facilities where individuals made monetary "contributions" for medical marijuana based on specific prices. The Taxpayers staffed the front desk and managed daily operations at the meeting places. They received monetary contributions in exchange for medical marijuana. The transfer of medical marijuana to members in exchange for money or other valuable consideration is a sale of personal property, which constitutes a "retail sale." Former RCW 82.04.040(1); RCW 82.04.050(1)(a). As such, the undisputed facts establish that GCC and TCC engaged in retail sales of marijuana. Former RCW 82.04.040(1); RCW 82.04.050(1)(a). Of course, we do not hold that under a different set of facts, all collective garden transactions are taxable.

C.  ALTERNATIVE ARGUMENT

GCC and TCC make the "alternative" argument that, at a minimum, a genuine issue of material fact existed regarding whether they engaged in taxable retail "sales" of medical marijuana. This argument fails.

We do not consider claims unsupported by legal authority, citation to the record, or argument.  RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).  And passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.  *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998); *see* RAP 10.3(a)(6).

The Taxpayers' argument that there is a genuine issue of material fact regarding whether GCC and TCC engaged in "sales" consists of a single sentence in the opening and reply briefs. They fail to provide any explanation or record citations to support that there is a genuine issue of material fact.  They do not state which material facts are disputed.  Thus, we decline to review this claim.  RAP 10.3(a)(6); *Cowiche Canyon Conservancy*, 118 Wn.2d at 809.

IV.  RETAIL SALES EXEMPTIONS

The Taxpayers argue that if they were engaged in medical marijuana retail sales, they were exempt from retail sales tax as a matter of law under exemptions for prescription drugs and medicines of botanical origin.  This argument fails.

A.  PRINCIPLES OF LAW

Statutory interpretation is a question of law we review de novo.  *HomeStreet, Inc. v. Dep't of Revenue*, 166 Wn.2d 444, 451, 210 P.3d 297 (2009).  "The primary objective of any statutory construction inquiry is 'to ascertain and carry out the intent of the Legislature.'"  *HomeStreet*, 166

Wn.2d at 451 (quoting *Rozner v. City of Bellevue*, 116 Wn.2d 342, 347, 804 P.2d 24 (1991)). When interpreting statutes, we "'avoid . . . creat[ing] conflicts between different provisions so that we achieve a harmonious statutory scheme.'" *Am. Legion Post #149 v. Dep't of Health*, 164 Wn.2d 570, 585, 192 P.3d 306 (2008) (quoting *Echo Bay Cmty. Ass'n v. Dep't of Nat. Res.*, 139 Wn. App. 321, 327, 160 P.3d 1083 (2007)).

To determine legislative intent, we begin with the statute's plain language, considering the plain and ordinary meaning of the statutory language. *Homestreet*, 166 Wn.2d at 451. In determining plain meaning, the court considers all the legislature has said in the statute and related statutes that disclose legislative intent. *Thorpe v. Inslee*, 188 Wn.2d 282, 289, 393 P.3d 1231 (2017). The court also considers the ordinary meaning of the words, basic rules of grammar, and the statutory context. *In re Forfeiture of One 1970 Chevrolet Chevelle*, 166 Wn.2d 834, 838-39, 215 P.3d 166 (2009). "To determine the plain meaning of an undefined term, we may look to the dictionary." *HomeStreet*, 166 Wn.2d at 451. "If the plain language is subject to only one interpretation, our inquiry ends because plain language does not require construction." *HomeStreet*, 166 Wn.2d at 451.

Tax exemptions must be narrowly construed. *HomeStreet*, 166 Wn.2d at 455. The party asserting the exemption has the burden to show it qualifies. *Activate, Inc. v. Dep't of Revenue*, 150 Wn. App. 807, 813, 209 P.3d 524 (2009). In the case of doubt or ambiguity, tax exemption statutes should be construed strictly, though fairly and in keeping with the ordinary meaning of their language, against the taxpayer. *Group Health Co-op. of Puget Sound, Inc. v. Wash. State Tax Comm'n*, 72 Wn.2d 422, 429, 433 P.2d 201 (1967).

## B. Prescription Drug Exemption

The parties dispute whether sales of medical marijuana satisfy the prescription drug retail sales tax exemption under former RCW 82.08.0281 (2004).[4]  We agree with the DOR that the Taxpayers' medical marijuana sales are not exempt from retail sales tax.

### 1. Principles of Law

Under former RCW 82.08.0281(1), retail sales taxes "shall not apply to sales of *drugs* for human use dispensed or to be dispensed to patients, pursuant to a *prescription*."  (Emphasis added.)  Former RCW 82.08.0281 provides definitions for the terms "drugs" and "prescription":

> (4)  The definitions in this subsection apply throughout this section. . . .
> (a)  "Prescription" means an *order*, formula, or recipe *issued* . . . by a duly licensed practitioner *authorized by the laws of this state to prescribe*.
> (b)  "Drug" means a . . . substance . . . :
> . . . .
> (ii)  Intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease; or
> (iii)  Intended to affect the structure or any function of the body.

### 2. Valid Documentation Is Not an "Order"

The parties dispute whether, as a matter of law, valid documentation for medical marijuana is a "prescription" within the meaning of former RCW 82.08.0281(4)(a), such that medical marijuana is a drug for human use dispensed pursuant to a *prescription* and thus eligible for the tax exemption.  In connection with this argument, the parties dispute whether valid documentation is an "*order*" within the plain meaning of former RCW 82.08.0281(4)(a).

---

[4] Under the current statutory scheme, the legislature explicitly exempts medical marijuana sales from retail sales tax but collects a 37 percent excise tax on the selling price of medical marijuana. RCW 82.08.9997; RCW 69.50.535.  During the relevant taxing period, medical marijuana was *not* explicitly exempted from retail sales tax.

A prescription is "an *order*, formula, or recipe *issued* . . . by a duly licensed practitioner authorized by the laws of this state to prescribe." Former RCW 82.08.0281(4)(a). To determine whether valid documentation for medical marijuana satisfies this definition, we begin by considering the plain and ordinary meaning of the statutory language. *Homestreet*, 166 Wn.2d at 451. We may turn to dictionary definitions to determine whether valid documentation is an "order." And where a technical term is used in its technical sense in a statute, the court applies a technical definition. *Tingey v. Haisch,* 159 Wn.2d 652, 658, 152 P.3d 1020 (2007).

"Order" ordinarily means "to give orders to: command . . . require or direct something to be done." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1588 (2002). "Valid documentation" is not a "command" in the ordinary sense because it merely documents that a patient *may* benefit from medical marijuana and is not a directive for a patient to use that substance or for any entity to dispense the substance. Former RCW 69.51A.010(7)(a).

Furthermore, the prescription drugs exemption from retail sales tax exempts those drugs that are "dispensed to patients . . . pursuant to a prescription" issued by a "duly licensed practitioner." Former RCW 82.08.0281(1), (4)(a). As such, the word "order" used within the "prescription" definition describes a licensed medical professional's "order." In this context, the word "order" is best understood by examining its technical medical meaning. *Tingey*, 159 Wn.2d at 658.

An "order," as defined by *Taber's Cyclopedic Medical Dictionary 1678 (22d ed. 2013),* means "[i]nstructions from a health care provider specifying patient treatment and care. A

14

directive mandating the delivery of specific patient care services."[5]  "Valid documentation" for medical marijuana does not specify patient treatment or care, or mandate delivery of specific services, so it is not an "order" in the technical sense.  Valid documentation merely includes a permissive and equivocal statement that a patient *may* benefit from medical use of marijuana. Former RCW 69.51A.010(7)(a).

According to the Taxpayers, valid documentation is "identical to any other prescription in both form and function" because both documents authorize possession of controlled substances. Br. of Appellant at 21.  The valid documentation may contain "many" of the same characteristics, including the date, a medical practitioner's name, registration number, and signature, the patient's identifying information, the drug's name and quantity, and the duration the drug is to be taken.  Br. of Appellant at 21.  The Taxpayers identify examples of valid documentation that allegedly contain information such as dosage and duration, and these examples could arguably support that the valid documentation specifies treatment and care.

But the examples that the Taxpayers point to merely state the number of plants that the patient may have and the expiration of the valid documentation—they do not actually provide "instructions . . . specifying patient treatment and care," including the appropriate dosage to use at one time or frequency and duration of use.  *Tabor's, supra*.  Furthermore, the Taxpayers fail to address other examples in the record of valid documentation that lack even the general information about the number of plants a patient may have or the expiration of the valid documentation.

---

[5] The Taxpayers argue that the technical definition of "order" is inapplicable because the definition of prescription was passed as part of a tax statute and is not intended to regulate medical professionals.  But they fail to provide authority to support that we cannot use a technical medical definition when interpreting a tax exemption related to a particular field.

Valid documentation is not an "order," and thus the superior court did not err when it concluded that valid documentation does not qualify as a "prescription" under former RCW 82.08.0281(4)(a). As such, medical marijuana is not a drug for human use dispensed or to be dispensed to patients pursuant to a *prescription*, and it does not qualify for the tax exemption under former RCW 82.08.0281(1).[6]

## C.  NATUROPATHIC MEDICINE EXCEPTION

The parties dispute whether, as a matter of law, the tax exemption for medicines used in treatment by naturopaths applies to medical marijuana. We agree with the DOR that, as a matter of law, a retail sale of medical marijuana does not qualify for the "naturopathic medicine" exemption.

Under RCW 82.08.0283(1)(b), retail sales tax does not apply to "[m]edicines of mineral, animal, and botanical origin prescribed, administered, dispensed, or used in the treatment of an individual by a person licensed under chapter 18.36A RCW [the chapter governing naturopathy]."

The Taxpayers assert that medical marijuana is a "'Medicine[] . . . prescribed, administered, dispensed, or used in the treatment of an individual'" by a naturopath. Br. of Appellant at 25 (quoting RCW 82.08.0283). To qualify for medical marijuana, a person must be diagnosed with a terminal or debilitating condition, which includes conditions "unrelieved by standard medical treatments or medications." Former RCW 69.51A.010(6)(b) (2010). According to the Taxpayers, when a naturopath provides valid documentation for a patient to obtain medical marijuana, the naturopath determines that the patient may benefit from the medical use of

---

[6] Accordingly, we do not reach the remaining issues regarding the applicability of the prescription drug exemption.

marijuana, which the Taxpayers assert is "a non-standard *medication*," because such patients have been unresponsive to standard medications. Br. of Appellant at 26 (emphasis added). Thus, the Taxpayers argue that medical marijuana is a "'medicine[]'" "'used in the treatment of an individual'" by a naturopath. Br. of Appellant at 26 (quoting RCW 82.08.0283).

This argument is unpersuasive. As the DOR asserts, naturopaths are not authorized to prescribe, administer, dispense, or use medical marijuana in their practice.[7] RCW 18.36A.040, .020(10). Under the statutes defining "naturopathic medicine" and the naturopathic scope of practice, schedule I drugs are not included in the enumerated treatments that naturopaths can utilize. RCW 18.36A.040, .020(10). In fact, "naturopathic medicines" provides that "[c]ontrolled substances are limited to codeine and testosterone products that are contained in Schedules III, IV, and V in chapter 69.50 RCW." RCW 18.36A.020(10). Marijuana, as a schedule I controlled substance, is not a "naturopathic medicine" and thus does not qualify as a "medicine[] . . . used in the treatment of an individual by a [naturopath.]" RCW 82.08.0283(1)(b).

The Taxpayers argue that the definitions under ch. 18.36A RCW are not related to the tax exemption for medicines of botanical origin. However, as stated above, the tax exemption explicitly states that medicines utilized only "in the treatment of an individual by a person licensed under chapter 18.36A RCW" are tax exempt. RCW 82.08.0283(1)(b). Thus, ch. 18.36 RCW is explicitly incorporated, and we may properly refer to its provisions.

Medical marijuana is not a naturopathic medicine because it is not a "[m]edicine[] of mineral, animal, and botanical origin prescribed, administered, dispensed, or used in the treatment

---

[7] Even the Taxpayers acknowledge that licensed naturopaths do not "use" medical marijuana "directly" in the course of patient treatment and provide only valid documentation to patients and advise them consistently with ch. 69.51A RCW.

17

of an individual by a person licensed under chapter 18.36A RCW." RCW 82.08.0283(1)(b). As such, the superior court did not err when it concluded as a matter of law that medical marijuana does not qualify for the naturopathic tax exemption. *See* RCW 82.08.0283(1)(b).

We affirm.

JOHANSON, J.

We concur:

BJORGEN, C.J.

SUTTON, J.